```
            IN THE UNITED STATES DISTRICT COURT FOR THE
                    EASTERN DISTRICT OF VIRGINIA
                        Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
         Plaintiff,                )   CR. NO. 09-156
                                   )
    vs.                            )
                                   )
SHERMAN ALAN TURNER,               )
                                   )
              Defendant.           )
_____     )
```

TRANSCRIPT OF SUPPRESSION HEARING

May 18, 2009

---


BEFORE:    THE HONORABLE GERALD BRUCE LEE
           UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    BY: J. CAM BARKER, ESQ.
                        JOHN EISINGER, ESQ.
                    2100 Jamieson Ave.
                    Alexandria, Virginia  22314


FOR MR. TURNER:    OFFICE OF THE FEDERAL PUBLIC DEFENDER
                   BY: AAMRA AHMAD, ESQ.
                       TODD RICHMAN, ESQ.



                          ---


OFFICIAL COURT REPORTER: RENECIA A. SMITH-WILSON,RMR,CRR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314

09:57:20

INDEX

ARGUMENTS BY GOVERNMENT  5, 89

ARGUMENTS BY DEFENDANT   3, 14, 74, 100

COURT'S RULING          16, 103

INDEX OF WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| L. Freedman | 17 | 38 | 56 | |
| S. Turner | 59 | 70 | 73 | |

| | | |
|---|---|---|
| 10:02:24 | 1 | (Thereupon, the following was heard in open |
| 10:02:24 | 2 | court at 10:02 a.m.) |
| 10:02:24 | 3 | THE CLERK:  1:09 criminal 156, United States |
| 10:02:28 | 4 | versus Sherman Alan Turner. |
| 10:02:31 | 5 | MR. BARKER:  Good morning, Your Honor.  Cam |
| 10:02:33 | 6 | Barker and John Eisinger for the United States. |
| 10:02:36 | 7 | THE COURT:  Good morning. |
| 10:02:37 | 8 | MS. AHMAD:  Good morning, Your Honor.  Aamra |
| 10:02:38 | 9 | Ahmad and Todd Richman on behalf of Mr. Turner who is |
| 10:02:43 | 10 | present. |
| 10:02:43 | 11 | THE COURT:  Good morning. |
| 10:02:46 | 12 | Good morning, Mr. Turner. |
| 10:02:47 | 13 | I'm ready.  I'm ready. |
| 10:02:49 | 14 | MS. AHMAD:  Your Honor, would you first like |
| 10:02:50 | 15 | to address the government's motion to quash or should we |
| 10:02:53 | 16 | move forward with the evidentiary hearing? |
| 10:02:56 | 17 | THE COURT:  I'm happy to proceed however you |
| 10:02:58 | 18 | would like. |
| 10:02:59 | 19 | MS. AHMAD:  I think we would first like to |
| 10:03:01 | 20 | address the government's motion to quash. |
| 10:03:02 | 21 | THE COURT:  All right. |
| 10:03:08 | 22 | MS. AHMAD:  If you've had the opportunity to |
| 10:03:11 | 23 | review the pleading that we filed Friday afternoon after |
| 10:03:14 | 24 | the government filed its motion, you'll see that we |
| 10:03:17 | 25 | believe that there are equitable reasons why the |

| | | |
|---|---|---|
| 10:03:20 | 1 | subpoena that we have been trying to serve to Officer |
| 10:03:24 | 2 | Daugherty should not be quashed and those reasons are |
| 10:03:26 | 3 | that we followed the Park Police officer's instructions |
| 10:03:30 | 4 | on how to serve the subpoena. |
| 10:03:32 | 5 | We applied for the subpoena in a timely |
| 10:03:35 | 6 | manner one day after the hearing was moved.  We received |
| 10:03:38 | 7 | it last week, I believe on Monday or Tuesday, on |
| 10:03:43 | 8 | May 11th. |
| 10:03:43 | 9 | We received it on May 11th from the Court. |
| 10:03:46 | 10 | My office continued to contact the Park Police to see |
| 10:03:49 | 11 | how it should properly be served and received those |
| 10:03:53 | 12 | instructions on May 12th. |
| 10:03:54 | 13 | On May 13th, my office followed the |
| 10:03:57 | 14 | instructions that the Park Police gave them. |
| 10:04:00 | 15 | Obviously it was not personally served.  We |
| 10:04:02 | 16 | don't deny that, and it wasn't until Friday that we were |
| 10:04:06 | 17 | told that the Park Police was not going to accept |
| 10:04:08 | 18 | service. |
| 10:04:09 | 19 | We have learned from the government that the |
| 10:04:12 | 20 | witness is out of town. |
| 10:04:15 | 21 | THE COURT:  Do you have his report?  Does he |
| 10:04:18 | 22 | have a report about this case? |
| 10:04:19 | 23 | MS. AHMAD:  We do have his report, Your |
| 10:04:21 | 24 | Honor. |
| 10:04:21 | 25 | THE COURT:  And what does it say about this |

| | | |
|---|---|---|
| 10:04:23 | 1 | case? |
| 10:04:24 | 2 | Was he involved in taking the statement, is |
| 10:04:32 | 3 | my question. |
| 10:04:33 | 4 | MS. AHMAD:  His report does not say that he |
| 10:04:35 | 5 | was involved in taking the statement.  It's a one |
| 10:04:37 | 6 | sentence report, I believe. |
| 10:04:38 | 7 | THE COURT:  Well, do you have any |
| 10:04:39 | 8 | information he knows about the facts of this case? |
| 10:04:42 | 9 | MS. AHMAD:  Yes, Your Honor.  He was present |
| 10:04:44 | 10 | during the search, and we believe that he was a witness |
| 10:04:46 | 11 | to the conversation between Mr. Turner and Officer |
| 10:04:52 | 12 | Freedman. |
| 10:04:52 | 13 | THE COURT:  Well, your brief says that he |
| 10:04:55 | 14 | came with the dog after the defendant was in the police |
| 10:04:57 | 15 | car; is that right? |
| 10:04:59 | 16 | MS. AHMAD:  That's correct.  But, the |
| 10:05:01 | 17 | conversation that occurred between Officer Freedman and |
| 10:05:04 | 18 | Mr. Turner occurred after the canine officer arrived and |
| 10:05:10 | 19 | while they were still on the scene. |
| 10:05:16 | 20 | THE COURT:  Okay, Mr. Barker. |
| 10:05:21 | 21 | MR. BARKER:  Well, I think there's two |
| 10:05:25 | 22 | separate issues here.  The first is whether the subpoena |
| 10:05:28 | 23 | itself was properly served and the second is if it |
| 10:05:31 | 24 | wasn't, what is the basis for a continuance. |
| 10:05:34 | 25 | Now, I think on the motion to quash, our |

| | | |
|---|---|---|
| 10:05:37 | 1 | simple argument is that it was not personally served on |
| 10:05:40 | 2 | this officer.  He was on leave.  His supervisor was not |
| 10:05:42 | 3 | able to contact him, and he just can't or shouldn't be |
| 10:05:47 | 4 | held to that under Rule 17 of the Federal Rules of |
| 10:05:50 | 5 | Criminal Procedure. |
| 10:05:50 | 6 | As for the continuance and whether the |
| 10:05:53 | 7 | subpoena was timely obtained, our position is that the |
| 10:05:57 | 8 | subpoena should have been obtained during preparation or |
| 10:06:00 | 9 | upon the filing of the defense's motion to suppress.  I |
| 10:06:04 | 10 | think you just heard the basis for anyone thinking in |
| 10:06:06 | 11 | this case that Officer Daugherty has nonpunitive |
| 10:06:10 | 12 | evidence is the defendant's information to his counsel |
| 10:06:13 | 13 | that he thinks Officer Daugherty may have overheard |
| 10:06:16 | 14 | something at the scene. |
| 10:06:17 | 15 | When the government talked to Officer |
| 10:06:20 | 16 | Daugherty, he said he had not heard anything at the |
| 10:06:22 | 17 | scene. |
| 10:06:22 | 18 | THE COURT:  Well, do you want to address the |
| 10:06:24 | 19 | issue about whether the Park Police misled counsel? |
| 10:06:28 | 20 | MR. BARKER:  I'd be happy to answer that. |
| 10:06:30 | 21 | And we think there's no equitable basis for that. |
| 10:06:33 | 22 | There's sort of two equitable claims.  The first is that |
| 10:06:35 | 23 | we misled defense counsel, and the second is the Park |
| 10:06:38 | 24 | Police did. |
| 10:06:39 | 25 | The first is that we told them that service |

| | | |
|---|---|---|
| 10:06:41 | 1 | upon a Park Police supervisor would be sufficient.  And |
| 10:06:45 | 2 | that is not the case.  I had a discussion with defense |
| 10:06:48 | 3 | team.  I believe it was Mr. Richman on May 4th about |
| 10:06:52 | 4 | subpoenaing Officer Daugherty.  And we had just received |
| 10:06:55 | 5 | a two-week training summary, and so I pretty much did |
| 10:07:00 | 6 | what that summary said which was to tell him that he |
| 10:07:02 | 7 | would have to comply with any applicable *Touhy* |
| 10:07:06 | 8 | regulations.  But I never told him that *Touhy* |
| 10:07:09 | 9 | regulations would be proper service of the subpoena. |
| 10:07:11 | 10 | I don't see why that would make sense. |
| 10:07:14 | 11 | Again, service on a supervisor just couldn't suffice to |
| 10:07:17 | 12 | constitute service on an employee who the supervisor may |
| 10:07:20 | 13 | not have any contact with, especially in an eleventh |
| 10:07:23 | 14 | hour case like this.  So what I think happened -- |
| 10:07:25 | 15 | THE COURT:  Well, I want to make sure I |
| 10:07:27 | 16 | understand.  You and the defense were aware of the |
| 10:07:30 | 17 | individuals present at the scene when Mr. Turner was |
| 10:07:32 | 18 | arrested, right? |
| 10:07:34 | 19 | MR. BARKER:  We became aware of that after |
| 10:07:36 | 20 | the defense filed their motion to suppress and we |
| 10:07:38 | 21 | started looking into what the facts were, correct. |
| 10:07:41 | 22 | THE COURT:  And you knew the defense wanted |
| 10:07:42 | 23 | to talk to Officer Daugherty or have him here? |
| 10:07:45 | 24 | MR. BARKER:  Well, we didn't know that until |
| 10:07:47 | 25 | they filed their motion to continue -- |

10:07:49  1          THE COURT:  Right.

10:07:50  2          MR. BARKER:  Right.

10:07:50  3          THE COURT:  So it was no surprise to you

10:07:52  4    that they wanted the officer here?

10:07:55  5          MR. BARKER:  No, that's correct.  There's no

10:07:57  6    surprise to us that --

10:07:58  7          THE COURT:  Well, do you think it would be

10:08:00  8    unreasonable for defense counsel to reply upon your

10:08:03  9    statement about how the *Touhy* regulations operated here?

10:08:06  10          MR. BARKER:  I do, because I never stated

10:08:09  11    that the *Touhy* regulations are sufficient to constitute

10:08:12  12    effective service of a subpoena.  And I never held that

10:08:17  13    view and I never stated it.

10:08:18  14          THE COURT:  So then in your view then in

10:08:21  15    every case where you as a prosecutor has a case and you

10:08:24  16    know that there's going to be a motion to suppress, then

10:08:28  17    the government won't even assist the counsel for the

10:08:32  18    defendant to try to bring the witnesses here.  We have

10:08:34  19    to chase down all of the witnesses, get subpoenas for

10:08:37  20    all of them.  Is that the way we have to do it all the

10:08:39  21    time?

10:08:39  22          MR. BARKER:  Well, I think this normal

10:08:42  23    service principle apply --

10:08:44  24          THE COURT:  Well, I wasn't asking you about

10:08:45  25    service.  I was asking you about just cooperating

| | | |
|---|---|---|
| 10:08:47 | 1 | amongst lawyers for a hearing that has been moved once |
| 10:08:50 | 2 | to try to bring all the material witnesses here. |
| 10:08:52 | 3 | MR. BARKER:  It is -- |
| 10:08:53 | 4 | THE COURT:  Would you let me finish. |
| 10:08:55 | 5 | Do you think it was appropriate for you to |
| 10:08:56 | 6 | just try and see if there was a way to get Officer |
| 10:09:00 | 7 | Daugherty here? |
| 10:09:00 | 8 | MR. BARKER:  If it was a material witness, I |
| 10:09:02 | 9 | think so.  If he had said he had -- |
| 10:09:02 | 10 | THE COURT:  So because you made a judgment |
| 10:09:03 | 11 | that the witness was not material, you didn't make the |
| 10:09:06 | 12 | extra effort to try to cooperate? |
| 10:09:09 | 13 | MR. BARKER:  I mean I guess that's right. |
| 10:09:11 | 14 | It's because Officer Daugherty didn't have anything to |
| 10:09:14 | 15 | add. |
| 10:09:14 | 16 | THE COURT:  Okay.  Well, let me say |
| 10:09:16 | 17 | something to you.  I'm going to make sure you understand |
| 10:09:18 | 18 | something here.  You may be absolutely right, |
| 10:09:21 | 19 | Mr. Barker, that the rules do not require you to give |
| 10:09:26 | 20 | legal advice to defense counsel. |
| 10:09:28 | 21 | Defense counsel should be able to figure out |
| 10:09:30 | 22 | for themselves what witnesses should be brought and how |
| 10:09:32 | 23 | the rules should be followed. |
| 10:09:33 | 24 | But, I think that what you should know is |
| 10:09:37 | 25 | that the Court would expect the lawyers to talk to each |

| | | |
|---|---|---|
| 10:09:44 | 1 | other.  And if there was some problem with Officer |
| 10:09:48 | 2 | Daugherty being on vacation to bring to the Court's |
| 10:09:51 | 3 | attention so that we could work out not having everybody |
| 10:09:54 | 4 | here all at one time for something you thought was not |
| 10:09:56 | 5 | material. |
| 10:09:57 | 6 | And, I want to make sure you understand what |
| 10:10:00 | 7 | I'm saying to you is what I think the other judges in |
| 10:10:03 | 8 | this court would say, too, and that is that this is |
| 10:10:04 | 9 | obviously a matter of some importance to the government |
| 10:10:07 | 10 | and to the defendant.  And for you to make an individual |
| 10:10:10 | 11 | judgment that it was not important enough to try to call |
| 10:10:13 | 12 | Officer Daugherty on the telephone is just very |
| 10:10:15 | 13 | disappointing to me and may have some consequences.  I |
| 10:10:18 | 14 | just want to make sure you're clear about that. |
| 10:10:20 | 15 | MR. BARKER:  I understand.  The Park Police |
| 10:10:21 | 16 | did try to get ahold of Officer Daugherty when this |
| 10:10:24 | 17 | case -- |
| 10:10:24 | 18 | THE COURT:  I said what I would expect you |
| 10:10:26 | 19 | to do -- |
| 10:10:26 | 20 | MR. BARKER:  Uh-huh. |
| 10:10:27 | 21 | THE COURT: -- as the lawyer for the |
| 10:10:28 | 22 | government -- |
| 10:10:28 | 23 | MR. BARKER:  Uh-huh. |
| 10:10:28 | 24 | THE COURT: -- whose job it is to seek |
| 10:10:31 | 25 | justice. |

10:10:33   1          MR. BARKER:  Okay.  I understand that.  And

10:10:35   2   I think the Court understands that in our view, just

10:10:39   3   didn't have any material information, but I understand

10:10:40   4   what --

10:10:41   5          THE COURT:  I know, but I want to make sure

10:10:43   6   you're listening to me because it is one of the reasons

10:10:45   7   that sometimes cases are dismissed because of a failure

10:10:48   8   to disclose exculpatory evidence, because a prosecutor

10:10:52   9   looks at the evidence and says well, this is not

10:10:54  10   exculpatory.  It does not exonerate the accused when the

10:10:56  11   definition of exculpatory evidence is much broader than

10:10:57  12   whether or not it exonerates the accused.

10:10:59  13          So as a teaching moment I'm trying to say to

10:11:02  14   you that I want you to see that this judge thinks that

10:11:05  15   your judgment about what the witness has to say is not

10:11:09  16   the way to make the determination of whether or not you

10:11:12  17   cooperate with counsel.

10:11:15  18          MR. BARKER:  Okay, I -- I understand that.

10:11:17  19          THE COURT:  Okay.  I want to make sure you

10:11:19  20   get that part of it.

10:11:19  21          MR. BARKER:  Okay.

10:11:20  22          THE COURT:  All right.  Now, as it relates

10:11:21  23   to the law, your view is that *Touhy* regulations do not

10:11:25  24   apply in this context because it only applies in civil

10:11:28  25   cases; is that right?

10:11:29   1          MR. BARKER:  Our view is two fold, that the

10:11:31   2   *Touhy* regulations do not change normal service

10:11:34   3   principles.

10:11:35   4          In the first place, they impose additional

10:11:39   5   requirements to allow the appropriate department a

10:11:42   6   chance to review the request for information and

10:11:46   7   determine whether to assert certain privileges, but they

10:11:49   8   don't excuse compliance with normal service principles.

10:11:53   9          Even if they did by their terms, they do not

10:11:56  10   apply to this criminal context.

10:11:58  11          As for the equitable positions, I realize

10:12:01  12   that I talked to the defense counsel about *Touhy*

10:12:03  13   regulations.  And I think what must have happened is

10:12:07  14   defense counsel was calling to ask what was sufficient

10:12:10  15   to be service.  I was notifying them that compliance

10:12:13  16   with *Touhy* was necessary and we must have had a

10:12:16  17   miscommunication there.

10:12:16  18          I also did talk to the Park Police officer

10:12:19  19   on Friday before we filed this motion to quash, and I

10:12:21  20   let the defense counsel know this by voicemail.

10:12:24  21          And I asked her did she have any contact

10:12:28  22   with the subpoena in this case, and she told me that

10:12:31  23   earlier in the week a defense investigator called her

10:12:34  24   asking about service of a civil subpoena and that she

10:12:38  25   remembers specifically that it was a civil subpoena

| | | |
|---|---|---|
| 10:12:41 | 1 | because that's what she does.  She doesn't do criminal |
| 10:12:45 | 2 | subpoenas. |
| 10:12:45 | 3 | And she told the investigators that she |
| 10:12:47 | 4 | would -- they do serve civil subpoenas on her.  Now, I |
| 10:12:50 | 5 | understand in their response they're offering to provide |
| 10:12:52 | 6 | testimony from the investigator that Major Smith was |
| 10:12:57 | 7 | accepting service of a criminal subpoena. |
| 10:12:59 | 8 | We didn't get this response until after the |
| 10:13:01 | 9 | close of business Friday, and so we don't have Major |
| 10:13:05 | 10 | Smith here and have time to subpoena her to get her |
| 10:13:08 | 11 | here. |
| 10:13:08 | 12 | But, you know, I don't think that affects |
| 10:13:09 | 13 | the calculus because the legal requirement is one of |
| 10:13:11 | 14 | simply just providing notice to the witness of where to |
| 10:13:14 | 15 | be and when. |
| 10:13:14 | 16 | But to the extent that that informs the |
| 10:13:16 | 17 | equitable calculus, we would just meet that as well. |
| 10:13:21 | 18 | So, that's our basis on the motion to quash. |
| 10:13:23 | 19 | THE COURT:  All right. |
| 10:13:24 | 20 | MR. BARKER:  And as for the continuance, |
| 10:13:27 | 21 | again, I think if the -- beginning from the time when |
| 10:13:29 | 22 | the suppression motion was filed, if Officer Daugherty |
| 10:13:33 | 23 | was nearby and heard anything, the only reason defense |
| 10:13:37 | 24 | counsel would think that could be because their client |
| 10:13:39 | 25 | told them so.  And that was -- provide ample time to |

| | | |
|---|---|---|
| 10:13:42 | 1 | subpoena him before the originally scheduled suppression |
| 10:13:46 | 2 | hearing date, for this suppression hearing date. |
| 10:13:49 | 3 | You know, the defense counsel never asked us |
| 10:13:51 | 4 | to tell Officer Daugherty voluntarily that they were |
| 10:13:56 | 5 | going to subpoena him.  And, you know, we had been |
| 10:13:59 | 6 | telling them that Officer Daugherty didn't have any |
| 10:14:01 | 7 | information. |
| 10:14:01 | 8 | And so, to a certain extent, I think I was |
| 10:14:04 | 9 | waiting for the subpoena to come in to understand that |
| 10:14:06 | 10 | they wanted him although I agree, you know, the basis |
| 10:14:08 | 11 | for the original motion was that they wanted to have him |
| 10:14:11 | 12 | here. |
| 10:14:12 | 13 | And so, I think with that -- |
| 10:14:14 | 14 | THE COURT:  I think you did interview |
| 10:14:16 | 15 | Officer Daugherty yourself. |
| 10:14:17 | 16 | MR. BARKER:  I talked to him on the phone |
| 10:14:19 | 17 | and he told me, that's right, that he was there at the |
| 10:14:21 | 18 | scene and he ran the dog over, that he did not interact |
| 10:14:25 | 19 | with the defendant and didn't overhear any sort of |
| 10:14:28 | 20 | interactions with the defendant. |
| 10:14:29 | 21 | THE COURT:  Thank you. |
| 10:14:34 | 22 | MS. AHMAD:  May I address some of the points |
| 10:14:36 | 23 | that the government raised? |
| 10:14:38 | 24 | THE COURT:  Yes. |
| 10:14:40 | 25 | MS. AHMAD:  First of all, we agree with |

10:14:41  1   their reading on the *Touhy* regulations and we're not

10:14:45  2   asking to -- to -- for the Court to deny their motion

10:14:50  3   based on the *Touhy* regulations.

10:14:52  4          We're only asked for that based on the

10:14:54  5   equitable reasons that we followed the Park Police's

10:14:57  6   instructions.

10:14:57  7          And also just to be clear, I don't think

10:15:03  8   that the government attorneys ever told us that that

10:15:05  9   would be sufficient service.  It was the Park Police.

10:15:09  10  So, we're not trying to say that the government

10:15:11  11  attorneys actually said that.

10:15:12  12         Mr. Rivera our investigator is available

10:15:17  13  here.  He's ready to testify as to his conversation with

10:15:20  14  the Park Police and that he did inform them that it was

10:15:24  15  a criminal subpoena or a subpoena in a criminal case and

10:15:28  16  that he was put on hold, and they came back and said

10:15:31  17  that's fine because they were concerned that it was

10:15:33  18  criminal and not civil.  But they ended up telling him

10:15:36  19  that that was fine.

10:15:37  20         We're not asking for a continuance here.

10:15:39  21  We're asking to bifurcate the hearing to give us the

10:15:42  22  opportunity to serve the officer after he returns

10:15:46  23  presumably after May 27th and to continue the hearing

10:15:50  24  after that date in order to give him the opportunity to

10:15:53  25  testify.

| | | |
|---|---|---|
| 10:15:54 | 1 | That's all. |
| 10:15:57 | 2 | THE COURT:  Well, let's start with this is a |
| 10:16:00 | 3 | motion to suppress the statement to Officer Freedman, |
| 10:16:03 | 4 | right? |
| 10:16:03 | 5 | MS. AHMAD:  Yes, Your Honor. |
| 10:16:04 | 6 | THE COURT:  And so, would you agree that the |
| 10:16:06 | 7 | key witnesses in that situation are going to be Officer |
| 10:16:09 | 8 | Freedman and I assume your client and any other person |
| 10:16:13 | 9 | who -- and this detective who was at the police station. |
| 10:16:16 | 10 | That's it, right? |
| 10:16:18 | 11 | MS. AHMAD:  Well, I think that those are at |
| 10:16:20 | 12 | the minimum the most necessary witnesses.  I do think |
| 10:16:23 | 13 | that Daugherty is also an important witness because we |
| 10:16:26 | 14 | do believe that he was privy to the interrogation with |
| 10:16:29 | 15 | my client. |
| 10:16:31 | 16 | THE COURT:  But, the bottom line is that |
| 10:16:33 | 17 | what you're trying to do is suppress the statement |
| 10:16:35 | 18 | allegedly made by Mr. Turner to Officer Freedman? |
| 10:16:38 | 19 | MS. AHMAD:  Yes, the statement was made to |
| 10:16:40 | 20 | Officer Freedman, not -- not to Officer Daugherty. |
| 10:16:43 | 21 | THE COURT:  All right.  I'm going to deny |
| 10:16:46 | 22 | the motion to quash.  I'm going to deny the motion to |
| 10:16:49 | 23 | bifurcate.  We're going to go forward with what we have |
| 10:16:52 | 24 | today and we'll hear the witness testimony. |
| 10:16:57 | 25 | You may proceed. |

| | | |
|---|---|---|
| 10:17:04 | 1 | MR. BARKER:  Thank you, Your Honor.  The |
| 10:17:05 | 2 | United States calls Officer Lynda Freedman. |
| 10:17:16 | 3 | MS. AHMAD:  Excuse me, Your Honor.  I would |
| 10:17:18 | 4 | just like to ask for the rule on witnesses. |
| 10:17:19 | 5 | THE COURT:  All right.  Any witnesses in the |
| 10:17:21 | 6 | courtroom?  No.  All right. |
| 10:17:22 | 7 | If you all let us know if any witnesses come |
| 10:17:24 | 8 | into the courtroom, please. |
| 10:17:36 | 9 | THEREUPON, LYNDA FREEDMAN, having been duly |
| 10:17:38 | 10 | sworn, testified as follows: |
| 10:17:38 | 11 | THE WITNESS:  Yes, I do. |
| 10:17:43 | 12 | MR. BARKER:  May I proceed, Your Honor? |
| 10:17:49 | 13 | THE COURT:  Yes. |
| 10:17:49 | 14 | DIRECT EXAMINATION |
| 10:17:49 | 15 | BY MR. BARKER: |
| 10:17:50 | 16 | Q.  Would you please state and spell your first and |
| 10:17:52 | 17 | last name for the record. |
| 10:17:53 | 18 | A.  Officer Lynda Freeman, F-R-E-E-D-M-A-N. |
| 10:17:58 | 19 | Q.  And your first name is spelled? |
| 10:18:00 | 20 | A.  L-Y-N-D-A, I'm sorry. |
| 10:18:02 | 21 | Q.  Who is your employer? |
| 10:18:03 | 22 | A.  I'm employed by the United States Park Police. |
| 10:18:05 | 23 | Q.  And were you so employed on January 9th of this |
| 10:18:07 | 24 | year? |
| 10:18:07 | 25 | A.  Yes, I was. |

10:18:09   1      Q.   What is your position with the Park Police?

10:18:11   2      A.   I'm a patrol officer for the George Washington

10:18:14   3   Memorial Parkway, District Two station.

10:18:17   4      Q.   And how long have you done that?

10:18:18   5      A.   I've been with the Park Police since June of

10:18:21   6   1999.

10:18:22   7      Q.   Were you on duty the morning of January 9, 2009?

10:18:26   8      A.   Yes, I was.

10:18:27   9      Q.   And, were you in uniform?

10:18:28   10      A.   Yes, I was.

10:18:29   11      Q.   Were you armed?

10:18:30   12      A.   Yes, I was.

10:18:32   13      Q.   That morning did you come into contact with the

10:18:37   14   defendant, Sherman Turner?

10:18:38   15      A.   Yes, I did.

10:18:39   16      Q.   Would you please identify him in court here

10:18:41   17   today.

10:18:41   18      A.   Yes, gentlemen sitting between his two lawyers

10:18:46   19   blue shirt, gray jacket.

10:18:48   20           MR. BARKER:  Your Honor, may the record

10:18:50   21   reflect the witness has identified the defendant?

10:18:53   22           THE COURT:  So noted.

10:18:54   23   BY MR. BARKER:

10:18:55   24      Q.   Where did you come in contact with the defendant?

10:18:57   25      A.   I came into contact with him in the back parking

| | | |
|---|---|---|
| 10:19:01 | 1 | lot of Belle Haven Park. |
| 10:19:04 | 2 | Q.   About what time? |
| 10:19:05 | 3 | A.   Approximately quarter to one, almost 1 a.m. |
| 10:19:12 | 4 | Q.   And is that park close or open at dark? |
| 10:19:14 | 5 | A.   It's posted closed at dark. |
| 10:19:17 | 6 | Q.   Where in the parking lot was the defendant's |
| 10:19:19 | 7 | vehicle? |
| 10:19:20 | 8 | A.   There are three parking lots in -- for Belle |
| 10:19:24 | 9 | Haven Park.  He was in the very northern-most lot |
| 10:19:28 | 10 | closest to the water. |
| 10:19:30 | 11 | Q.   With the assistance of the court security |
| 10:19:32 | 12 | officer, I'd like to hand you what's been marked for |
| 10:19:36 | 13 | identification as Government's Exhibit 2, a copy of |
| 10:19:38 | 14 | which has been provided to the defense counsel and an |
| 10:19:44 | 15 | extra copy of which I do have for the Judge if the court |
| 10:19:47 | 16 | security officer would be so kind as to pass that up. |
| 10:19:54 | 17 |      Is this a fair and accurate depicts of the Belle |
| 10:19:58 | 18 | Haven parking lot area as it was configured on |
| 10:20:01 | 19 | January 9th of this year? |
| 10:20:01 | 20 | A.   The configuration is -- I said it was 1 a.m. -- |
| 10:20:06 | 21 | almost 1 a.m. in the morning and his vehicle was the |
| 10:20:10 | 22 | only vehicle in any of the three parking areas. |
| 10:20:12 | 23 | Q.   Can you just please describe for us where the |
| 10:20:14 | 24 | Belle Haven parking area is.  Is it to the right of the |
| 10:20:17 | 25 | road labeled George Washington Memorial Parkway? |

10:20:20    1        A.   Yes, closest to the water.

10:20:22    2        Q.   Do you see on the upper left-hand corner of this

10:20:25    3   picture there's a parking lot with two rows of parking

10:20:28    4   spaces?

10:20:28    5        A.   Yes.

10:20:29    6        Q.   And then below that there's a parking lot with

10:20:31    7   one row?

10:20:32    8        A.   Yes.

10:20:32    9        Q.   And then below that there's another parking lot

10:20:34   10   with two rows?

10:20:35   11        A.   That's correct.

10:20:36   12        Q.   Where -- which of those three parking lots was

10:20:39   13   the defendant's vehicle in?

10:20:40   14        A.   The very northern most, towards the top of the

10:20:43   15   page.

10:20:44   16        Q.   Do you see near the top of the page in the north

10:20:47   17   part of that parking lot, there's like a blue car there?

10:20:50   18        A.   A dark color.

10:20:51   19        Q.   Dark color.  Where in relation to that was the

10:20:54   20   defendant's vehicle?

10:20:55   21        A.   Within one or two spaces, just north of that

10:21:02   22   vehicle.

10:21:03   23             THE COURT:  I'm sorry, could you point to

10:21:05   24   which one you're looking at.

10:21:08   25             THE WITNESS:  To the north, Your Honor.  Up

| | | |
|---|---|---|
| 10:21:09 | 1 | towards the top, you have the dark one. |
| 10:21:11 | 2 | THE COURT:  All the way up at the top? |
| 10:21:13 | 3 | THE WITNESS:  Yes, it's on the far right. |
| 10:21:14 | 4 | And then his vehicle was either in the |
| 10:21:16 | 5 | space -- one or two spaces above that one. |
| 10:21:20 | 6 | THE COURT:  Thank you. |
| 10:21:22 | 7 | BY MR. BARKER: |
| 10:21:22 | 8 | Q.  What kind of vehicle was it? |
| 10:21:24 | 9 | A.  I believe it was a Chevy pickup truck. |
| 10:21:29 | 10 | Q.  What direction was it facing in the parking lot |
| 10:21:31 | 11 | space? |
| 10:21:32 | 12 | A.  He was backed into the space, so he would have |
| 10:21:34 | 13 | been facing westbound or towards the west. |
| 10:21:41 | 14 | MR. BARKER:  Your Honor, we're not moving |
| 10:21:42 | 15 | this into evidence, but we would ask that Government's |
| 10:21:45 | 16 | Exhibit 2 be made part of the record in this case as a |
| 10:21:48 | 17 | demonstrative. |
| 10:21:48 | 18 | THE COURT:  All right. |
| 10:21:50 | 19 | BY MR. BARKER: |
| 10:21:50 | 20 | Q.  How close to the George Washington Memorial |
| 10:21:53 | 21 | Parkway was the defendant's truck? |
| 10:21:55 | 22 | A.  Sixty, 70 feet. |
| 10:21:58 | 23 | Q.  At the defendant's truck, could you see other |
| 10:22:00 | 24 | cars going by along the Parkway? |
| 10:22:03 | 25 | A.  If they passed by at that time of the morning, |

10:22:06   1    yes.

10:22:06   2        Q.  Were the leaves on the trees at this time of the

10:22:09   3    year?

10:22:09   4        A.  Not that I recall, no.

10:22:11   5        Q.  When you got to the scene, how many -- were you

10:22:15   6    the only officer?

10:22:16   7        A.  Yes, I was.

10:22:17   8        Q.  And, what did you do upon seeing the defense

10:22:20   9    vehicle there?

10:22:21  10        A.  Rolled it -- drove into the parking area, parked,

10:22:28  11    sort of catty-corner to him, used my spotlight and

10:22:36  12    illuminated the cab of the truck.

10:22:39  13        Q.  How many people were inside of the cab of the

10:22:41  14    truck?

10:22:41  15        A.  Two.

10:22:42  16        Q.  What were they doing?

10:22:44  17        A.  Trying to get clothes on.

10:22:49  18        Q.  Did you get out of your cruiser and approach the

10:22:51  19    truck?

10:22:52  20        A.  Yes, I did.

10:22:52  21        Q.  What did you do when you got there?

10:22:54  22        A.  I approached the vehicle from the passenger side,

10:22:59  23    it was a four-door pickup.  I observed a female who I

10:23:05  24    later identified as Ms. Weeks.  She was, from what I

10:23:11  25    could see at that point, completely naked.  I saw

10:23:16  1   Mr. Turner sitting in the left rear back of the truck.

10:23:25  2   He began reaching down.  I could tell he didn't have a

10:23:28  3   shirt on.

10:23:29  4        I then opened the door of the -- the rear door of

10:23:35  5   the pickup.

10:23:37  6        Q.  Why did you open the door?

10:23:38  7        A.  Because of the furtive movement, for my safety.

10:23:42  8        Q.  Upon opening the door, what if anything did you

10:23:44  9   smell?

10:23:45  10       A.  As I opened the door, I had a large plume of

10:23:49  11  smoke bellow out, and it smelled as if it was a burned

10:23:58  12  marijuana cigarette.

10:23:59  13       Q.  Upon smelling that smoke, what did you ask the

10:24:03  14  subjects to do, the occupants of the car?

10:24:04  15       A.  I had them first get dressed and asked for their

10:24:08  16  IDs.

10:24:09  17       Q.  Did you ask them to get out of the car?

10:24:11  18       A.  After they were dressed, yes.

10:24:14  19       Q.  And, what identifications did they provide?

10:24:19  20       A.  Driver's licenses.

10:24:26  21       Q.  Based on the marijuana smoke, what did you decide

10:24:29  22  to do next?

10:24:30  23       A.  Do a search for more contraband or search for any

10:24:35  24  contraband that may be in the vehicle.

10:24:39  25       Q.  What did you find?

10:24:41  1      A.   I later found on the center console a Newport

10:24:47  2   cigarette box with burn marijuana -- what appeared to be

10:24:52  3   burn marijuana cigarettes.

10:24:53  4      Q.   And what did you do upon finding what appeared to

10:24:56  5   be the marijuana cigarettes?

10:24:59  6      A.   I believe I handcuffed -- if I remember

10:25:08  7   everything, I handcuffed or detained Mr. Turner, had Ms.

10:25:13  8   Weeks sit down on the curb.  I was going to ask

10:25:17  9   Mr. Turner to sit down.  He said because he had a

10:25:19  10  prosthetic leg that he couldn't -- he didn't have it on

10:25:24  11  correctly or there was a problem.  I asked him, fine, to

10:25:25  12  sit on the left rear -- towards the left rear bumper of

10:25:27  13  his truck.

10:25:29  14     Q.   Why did you handcuff the defendant?

10:25:31  15     A.   For my safety.

10:25:33  16     Q.   Did you tell him that he was under arrest?

10:25:35  17     A.   No, I did not.

10:25:38  18     Q.   Turning back to the vehicle search, after you

10:25:42  19  found what appeared to be the marijuana cigarettes, what

10:25:46  20  radio communications did you have?

10:25:48  21     A.   I advised our communication section through --

10:25:51  22  via my force-issued portable radio that I had minor

10:25:56  23  narcotics.

10:25:57  24     Q.   And who was the first officer to respond after

10:25:59  25  that?

10:26:00   1        A.   Officer Vinyard.

10:26:03   2        Q.   How did he come to the scene?

10:26:05   3        A.   In his cruiser, assigned cruiser for the unit.

10:26:10   4        Q.   So, at that point, there were two cruisers at the

10:26:13   5   scene?

10:26:13   6        A.   Yes, they were.

10:26:14   7        Q.   And when he arrived, where were the defendant and

10:26:16   8   the other occupant, Ms. Weeks taken?

10:26:19   9        A.   Mr. Turner was escorted over to Officer Vinyard's

10:26:26  10   cruiser and placed in the right rear seat of the

10:26:29  11   cruiser.  And Ms. Weeks was placed in the right rear

10:26:35  12   seat of my cruiser.

10:26:36  13        Q.   Why were they being moved to the cruisers?

10:26:39  14        A.   I wanted to keep them separated, too, because of

10:26:43  15   the elements.  It was fairly cold the night -- or

10:26:46  16   morning.

10:26:46  17        Q.   You wanted to keep them separated for security

10:26:49  18   reasons?

10:26:50  19        A.   Correct.

10:26:50  20        Q.   Had you decided whether to arrest Mr. Turner and

10:26:53  21   the defendant at that point?

10:26:54  22        A.   No.

10:26:57  23        Q.   Why not?

10:26:58  24        A.   With that minor amount of narcotics, we don't

10:27:02  25   necessarily always arrest everybody.

10:27:05  1      Q.  So, had you told the defendant whether he was

10:27:07  2  arrest at that point?

10:27:10  3      A.  Not that I recall, no.

10:27:12  4      Q.  Who was the next officer to arrive?

10:27:13  5      A.  Officer Daugherty.

10:27:15  6      Q.  Which office is he from?

10:27:17  7      A.  He works for our special forces branch as a

10:27:21  8  canine officer.

10:27:22  9      Q.  And, what did he do when he arrived?

10:27:25  10      A.  I advised him that I had found some possible

10:27:29  11  marijuana, asked him if he'd let his dog go through the

10:27:34  12  vehicle.

10:27:34  13      Q.  And, did the dog give some response at places on

10:27:41  14  the truck?

10:27:41  15      A.  Officer Daugherty I believe told me later that

10:27:44  16  the dog seem interested somewhere near the front --

10:27:47  17  center front console of the pickup.

10:27:48  18      Q.  During your search of the truck for the

10:27:52  19  narcotics, what else did you find relevant to this case?

10:27:55  20      A.  As we were searching the front -- the center

10:28:00  21  console of the pickup truck, Officer Vinyard was looking

10:28:04  22  in the back passenger area, and he was in -- he had a

10:28:08  23  better vantage points and he advised me that he observed

10:28:13  24  what appeared to be a handle of a firearm.

10:28:18  25      Q.  Did you see that gun as well?

10:28:20    1      A.   Once he advised me of it, I was able to get up

10:28:24    2   higher and look down between the seat and the center

10:28:26    3   console and observed it.

10:28:28    4      Q.   So, he didn't touch the gun?

10:28:29    5      A.   No, I recovered the weapon.

10:28:32    6      Q.   You removed the gun from between the driver seat

10:28:37    7   and the center console?

10:28:38    8      A.   Yes.

10:28:38    9      Q.   What did you do with it once you recovered it?

10:28:41   10      A.   Once I recovered it, I made the weapon safe,

10:28:44   11   emptied the magazine, locked the chamber to the rear.

10:28:49   12      Q.   Let's turn to the permit for a little bit.  Have

10:28:51   13   you had previous case where a person found in the park

10:28:55   14   with a handgun had a gun permit?

10:28:57   15      A.   Yes.

10:28:57   16      Q.   Because of the permit, what happened in that case

10:29:00   17   or cases?

10:29:00   18      A.   He was -- the case I had several -- a few years

10:29:04   19   ago had a gentleman who had a weapon on the Parkway, did

10:29:08   20   not realize that he couldn't have weapons on the -- he

10:29:11   21   didn't realize that GW Parkway was a federal parkway and

10:29:15   22   that he couldn't have a weapon.

10:29:19   23           He stated or advised me that he had a

10:29:23   24   carry/conceal permit.  He produced that permit, ran a

10:29:29   25   check of the weapon, made sure it wasn't stolen, advised

| | | |
|---|---|---|
| 10:29:33 | 1 | him that this was federal parkway or federal land and |
| 10:29:38 | 2 | that he couldn't have that weapon even though he had a |
| 10:29:40 | 3 | permit. |
| 10:29:42 | 4 | I then seized the weapon, wrote a report, |
| 10:29:48 | 5 | forwarded it to the U.S. Attorney's Office, and U.S. |
| 10:29:54 | 6 | Attorney Rose Haney declined prosecution on him. |
| 10:29:58 | 7 | Q.  Was the defendant arrested in that case? |
| 10:29:59 | 8 | A.  No, he was not. |
| 10:30:00 | 9 | Q.  So, what is the significant of the permit in your |
| 10:30:02 | 10 | summons versus arrest decision? |
| 10:30:05 | 11 | A.  People don't realize that the George -- that the |
| 10:30:07 | 12 | George Washington Memorial Parkway is a federal parkway. |
| 10:30:11 | 13 | And unlike other areas in Virginia where you have a |
| 10:30:17 | 14 | carry/conceal permit where it would be somewhat legal to |
| 10:30:22 | 15 | have, it's not the case on the Parkway. |
| 10:30:24 | 16 | Q.  And because of that would your summons arrest |
| 10:30:27 | 17 | decision be affected by a permit? |
| 10:30:29 | 18 | A.  It -- yes. |
| 10:30:31 | 19 | Q.  Before you had any further interactions with the |
| 10:30:34 | 20 | defendant, had you reached the conclusion about who the |
| 10:30:36 | 21 | gun belonged to? |
| 10:30:39 | 22 | A.  The fact that the vehicle was registered to |
| 10:30:42 | 23 | Mr. Turner, the seat -- the weapon was found on the |
| 10:30:48 | 24 | driver's side to the right of the seat and into the |
| 10:30:52 | 25 | center console where if you're driving, you'd stick your |

| | | |
|---|---|---|
| 10:30:56 | 1 | hand right down and you could pull it out.  I made the |
| 10:31:00 | 2 | assumption the weapon was his. |
| 10:31:01 | 3 | Q.  Based on that determination, what did you ask the |
| 10:31:03 | 4 | defendant next? |
| 10:31:06 | 5 | A.  I walked over to Officer Vinyard's cruiser, |
| 10:31:10 | 6 | opened the door, leaned in and just asked him did he |
| 10:31:19 | 7 | have a permit -- something to the effect of did he have |
| 10:31:22 | 8 | a permit for the weapon. |
| 10:31:23 | 9 | Q.  So, you had been at the defendant's truck and |
| 10:31:26 | 10 | walked to Officer Vinyard's cruiser; is that right? |
| 10:31:30 | 11 | A.  Yes. |
| 10:31:30 | 12 | Q.  Was the window on the rear area up or down? |
| 10:31:34 | 13 | A.  I believe it was up. |
| 10:31:35 | 14 | Q.  And then you opened the rear door of his cruiser? |
| 10:31:38 | 15 | A.  Yes. |
| 10:31:39 | 16 | Q.  Did you get into the cruiser to ask the question |
| 10:31:41 | 17 | or asked him from outside? |
| 10:31:43 | 18 | A.  I think I had my arm up on top of the door frame |
| 10:31:47 | 19 | and just leaned in and asked him. |
| 10:31:49 | 20 | Q.  And, as precisely as you can recall, what did you |
| 10:31:53 | 21 | ask the defendant at that point? |
| 10:31:55 | 22 | A.  Something to the effect of do you have a permit |
| 10:31:56 | 23 | for the weapon or do you have a permit. |
| 10:32:00 | 24 | Q.  And to be clear, you did not read the defendant |
| 10:32:03 | 25 | Miranda warnings before asking that permit question, |

10:32:06   1   correct?

10:32:06   2       A.  No, I did not.

10:32:07   3       Q.  Why not?

10:32:08   4       A.  Hadn't decided whether he was going to be under

10:32:11   5   arrest at that point in time.  Like I said, giving him

10:32:15   6   the opportunity that maybe he did have a conceal/carry

10:32:19   7   permit.

10:32:22   8       Q.  Was your question designed to elicit an

10:32:25   9   incriminating response?

10:32:27  10       A.  No.

10:32:32  11       Q.  In asking that question, were you thinking ahead

10:32:35  12   to how an interview at the police station would be

10:32:38  13   performed?

10:32:38  14       A.  No.

10:32:39  15       Q.  Did you have any specific plans for an interview

10:32:42  16   of the defendant at the police station?

10:32:43  17       A.  I hadn't thought that far, formulated anything at

10:32:47  18   that point, no.

10:32:48  19       Q.  At that point, did you know Detective Monahan was

10:32:52  20   at the police station?

10:32:53  21       A.  No, I did not.

10:32:54  22       Q.  In the course of preparing for this hearing, have

10:32:57  23   you been made aware of a so-called question-first

10:33:00  24   interrogation strategy in which an officer who knows

10:33:04  25   Miranda warnings are required deliberately withholds the

10:33:08  1    warnings, obtains a confession and then have herself or

10:33:12  2    other officer re -- Mirandize for the first time the

10:33:15  3    defendant, re-asked the question and obtain this time a

10:33:18  4    Mirandized confession?

10:33:19  5        A.   We went over that in the prep this morning, yes.

10:33:23  6        Q.   Is there any Park Police policy directing

10:33:25  7    officers to use a question-first interrogation technique

10:33:31  8    of that nature?

10:33:32  9        A.   No, there's not.

10:33:33  10       Q.   Have you ever been instructed informally to use a

10:33:36  11   technique of that nature?

10:33:37  12       A.   No, I have not.

10:33:38  13       Q.   Were you in fact using a technique of that nature

10:33:41  14   on January 9th?

10:33:43  15       A.   No.

10:33:44  16       Q.   When you asked the defendant if he had a permit,

10:33:46  17   what did the defendant say?

10:33:47  18       A.   I can't remember exactly if he said no or shook

10:33:54  19   his head, but his body language.

10:33:56  20       Q.   He indicated no in some way?

10:33:58  21       A.   Right, and plus his body language just made me

10:34:02  22   believe that he knew he shouldn't have had that weapon.

10:34:05  23       Q.   And was it at that point you made the arrest

10:34:08  24   decision?

10:34:08  25       A.   In my mind, yes.

10:34:10   1        Q.   Did you arrest him because he lacked the permit?

10:34:15   2        A.   The totality of the circumstances.

10:34:19   3        Q.   Did you ask the defendant any more questions

10:34:21   4   about the gun?

10:34:22   5        A.   No.

10:34:23   6        Q.   Why not?

10:34:24   7        A.   I knew I hadn't Mirandized him.  I wanted to do

10:34:29   8   all that in a more formal setting at the station.  I

10:34:33   9   knew I wasn't going to ask him any more questions.

10:34:36   10       Q.   Do you recall whether you told the defendant if

10:34:38   11  he was under arrest at that point?

10:34:39   12       A.   I don't recall, sorry.

10:34:43   13       Q.   About what time was the arrest?

10:34:46   14       A.   Somewhere between one -- anywhere after 1:15,

10:34:55   15  maybe 1:30, a little bit longer.  I don't recall the

10:34:58   16  exact times.

10:34:59   17       Q.   When you decided to arrest the defendant, what if

10:35:02   18  anything did you discuss with him about what would be

10:35:05   19  done with his truck?

10:35:07   20       A.   I don't recall exactly if I told him or I advised

10:35:11   21  Officer Vinyard to tell him that I was going to secure

10:35:13   22  the vehicle on scene and bring the keys back with me.

10:35:17   23       Q.   So, you may have had further interactions with

10:35:19   24  him about the truck, but you don't --

10:35:21   25       A.   Just letting him know what was going to happen

10:35:24   1    with his vehicle.

10:35:24   2        Q.   Where was the defendant taken at that point?

10:35:26   3        A.   Officer Vinyard transported Mr. Turner from the

10:35:29   4    scene to District Two.

10:35:31   5        Q.   To the District Two police station?

10:35:33   6        A.   Yes, I'm sorry.

10:35:34   7        Q.   Of the U.S. Park Police?

10:35:36   8        A.   Yes.

10:35:37   9        Q.   And did you follow Officer Vinyard there at that

10:35:40  10    point or did you stay at the scene?

10:35:41  11        A.   I remained on scene.

10:35:42  12        Q.   Why did you remain at the scene?

10:35:45  13        A.   We had called Ms. Weeks's mother to come pick her

10:35:49  14    up, and we had to wait for -- as I didn't want to leave

10:35:55  15    her out there in the cold waiting for somebody not

10:35:58  16    knowing how long they were going to be.  So --

10:36:01  17        Q.   How long did you wait until --

10:36:03  18        A.   It could have been a minimum of a half hour,

10:36:06  19    maybe longer.

10:36:08  20        Q.   Do you recall if it was before or after 2 a.m.?

10:36:11  21        A.   May have been around that time.  I don't recall

10:36:15  22    exactly.

10:36:16  23        Q.   Well, after Ms. Weeks's mother came, where did

10:36:19  24    you go?

10:36:20  25        A.   I then went -- proceeded directly to District

| 10:36:25 | 1 | Two. |

10:36:25   2       Q.   Whom did you encounter there?

10:36:29   3       A.   My sergeant and Officer Monahan or Detective

10:36:33   4   Sergeant Monahan.

10:36:34   5       Q.   What did Detective Sergeant Monahan offer to do?

10:36:38   6       A.   He asked if I wanted him to do the interview --

10:36:42   7   try and do the interview.

10:36:43   8       Q.   And what did you say?

10:36:44   9       A.   I told him I'd greatly appreciate it.

10:36:47  10       Q.   Why would you greatly appreciate it?

10:36:50  11       A.   He has a lot better -- he has excellent people

10:36:55  12   and interview skills.  He is more thoroughly trained in

10:36:58  13   interviewing since he works as a detective sergeant.

10:37:02  14       Q.   What else were you doing while the interview took

10:37:04  15   place?

10:37:05  16       A.   During the interview, I was trying to process the

10:37:08  17   evidence.

10:37:10  18       Q.   Well, before the interview started, did you tell

10:37:14  19   Detective Monahan what the defendant said or -- about a

10:37:17  20   gun permit at the scene of the stop?

10:37:19  21       A.   I don't recall telling him any of that.

10:37:22  22       Q.   Did you tell him about any oral statements the

10:37:26  23   defendant made at the scene of the stop?

10:37:28  24       A.   Not that I recall, no.

10:37:30  25       Q.   I assume you told Officer Monahan the nature of

| 10:37:33 | 1 | the case? |

    A.   He knew -- he was listening to the radio and he
knew part of it and I may have shown him the weapon that
I recovered as well as the possible narcotics.

    Q.   Where did the interview occur in the police
station?

    A.   In our processing area.

    Q.   Where were you when Detective Monahan began the
interview?

    A.   When he was doing the Miranda, I was in what we
call our 200 area which is an office directly -- there's
a door that leads into the processing and has a mesh
window.

    Q.   So, did you witness Detective Monahan administer
the defendant Miranda rights?

    A.   Yes, I did.

    Q.   Where did you witness that from?

    A.   From the 200 area.

    Q.   So you were not in the interview room but in the
adjacent room?

    A.   Correct.

    Q.   Did you later sign the Miranda card that
memorializes the warnings administered?

    A.   Yes, I did.

    Q.   With the assistance of the court security

| | | |
|---|---|---|
| 10:38:32 | 1 | officer, I'd like to hand you what's been marked for |
| 10:38:35 | 2 | identification as Government's Exhibit 1.  I have an |
| 10:38:38 | 3 | extra copy for Your Honor and a copy is provided to |
| 10:38:44 | 4 | defense counsel. |
| 10:38:54 | 5 | Do you recognize this document? |
| 10:38:55 | 6 | A.  Yes, I do. |
| 10:38:56 | 7 | Q.  What is it? |
| 10:38:57 | 8 | A.  It's a photocopy of the front and back of our |
| 10:39:01 | 9 | Miranda cards that we read. |
| 10:39:04 | 10 | Q.  Is that the Miranda card that you signed? |
| 10:39:06 | 11 | A.  Yes, it's a -- it is a copy of one I signed. |
| 10:39:09 | 12 | Q.  How do you know that? |
| 10:39:10 | 13 | A.  My signature is the last signature.  It has -- |
| 10:39:15 | 14 | also has my badge number on it. |
| 10:39:18 | 15 | Q.  Did you participate in Detective Monahan's |
| 10:39:21 | 16 | interview of the defendant? |
| 10:39:22 | 17 | A.  No, I did not. |
| 10:39:23 | 18 | Q.  Where were the other officers in the |
| 10:39:27 | 19 | station during the interview of the defendant? |
| 10:39:29 | 20 | A.  They were -- if there wasn't -- in the station, |
| 10:39:33 | 21 | they were -- I believe my sergeant was in the report |
| 10:39:37 | 22 | writing room that I later went to start the different |
| 10:39:44 | 23 | paperwork for the evidence and my reports that needed to |
| 10:39:47 | 24 | be subsequently written. |
| 10:39:50 | 25 | Q.  Turning your attention to your interactions with |

L. Freedman - Cross

10:39:53  1   the defendant that morning including at the scene of the

10:39:55  2   stop, what tone of voice did you use to speak to the

10:39:58  3   defendant?

10:39:59  4       A.   Professional.

10:40:02  5       Q.   Comparable to the tone you're using now?

10:40:06  6       A.   Somewhat, yes.

10:40:06  7       Q.   In what respects was it different?

10:40:09  8       A.   Piercing loud noise and a helicopter above.  I

10:40:13  9   may have had to talk up because of the outside factors.

10:40:18  10      Q.   How cooperative was the defendant at the stop?

10:40:21  11      A.   He appeared fairly cooperative.

10:40:24  12      Q.   And, did the defendant seem frightened at the

10:40:27  13  stop?

10:40:28  14      A.   Not that I read or felt.

10:40:31  15      Q.   Did you ever draw your weapon?

10:40:33  16      A.   No, I did not.

10:40:34  17      Q.   Did you ever brandish your weapon?

10:40:36  18      A.   No.

10:40:37  19      Q.   Did you ever threaten the defendant?

10:40:39  20      A.   No.

10:40:41  21      Q.   Did the defendant ever say anything to indicate

10:40:43  22  that he felt threatened?

10:40:44  23      A.   No, not that I recall.

10:40:48  24           MR. BARKER:  With the Court's indulgence a

10:40:49  25  moment.

10:40:59   1   BY MR. BARKER:

10:41:00   2      Q.   Turning your attention back to the scene of the

10:41:02   3   stop when you went to Officer Vinyard's cruiser to ask

10:41:05   4   the defendant about the permit, where were the other

10:41:08   5   officers when you asked that question?

10:41:10   6      A.   I believe that Officer Daugherty and Officer

10:41:14   7   Vinyard were trying to recover a sword cane that was in

10:41:21   8   the very back --

10:41:22   9      Q.   A sword cane being an item of evidence also found

10:41:25  10   in the defendant's truck?

10:41:26  11      A.   Yes.

10:41:27  12      Q.   Where was Ms. Weeks when you --

10:41:30  13      A.   She was still in the back of my cruiser.

10:41:32  14      Q.   Were the windows in that cruiser also up?

10:41:35  15      A.   Yes, they were.

10:41:38  16           MR. BARKER:   No further questions, Your

10:41:40  17   Honor.

10:41:41  18                   CROSS-EXAMINATION

10:41:41  19   BY MR. RICHMAN:

10:41:49  20      Q.   Good morning, Officer Freedman.

10:41:50  21      A.   Good morning.

10:41:50  22      Q.   How long have you been with the U.S. Park Police?

10:41:53  23      A.   Since June of 1999.

10:41:55  24      Q.   So, just about ten years?

10:41:56  25      A.   Yes, sir.

10:41:57  1      Q.   And, your regular duties in the Park Police,

10:42:01  2   you've been a patrol officer that whole time?

10:42:03  3      A.   Yes, sir.

10:42:03  4      Q.   So, your regular duties include traffic stops?

10:42:06  5      A.   Yes.

10:42:06  6      Q.   And, you work full time for the Park Police?

10:42:10  7      A.   Yes, I do.

10:42:11  8      Q.   And has that been true regularly since

10:42:15  9   January 9th, the time of this incident?

10:42:17  10     A.   Yes.

10:42:18  11     Q.   And, in a typical shift, you interact with

10:42:22  12  members of the public virtually every shift, correct?

10:42:25  13     A.   Yes, sir.

10:42:26  14     Q.   And that includes issuing summons and citations?

10:42:29  15     A.   Citations, warning notices.

10:42:31  16     Q.   And making arrests?

10:42:33  17     A.   Yes, sir.

10:42:33  18     Q.   And, that's been true for all your shifts, full

10:42:37  19  time for the four months since this arrest, correct?

10:42:40  20     A.   Yes, sir.

10:42:41  21     Q.   Now, on the night of January 9th, you had

10:42:44  22  testified that you started your investigation about

10:42:46  23  quarter of one?

10:42:47  24     A.   Approximately.  I think the -- according to the

10:42:52  25  radio logs, I went out with it at 12:47.

10:42:57  1      Q.  And, the reason you approached the vehicle you

10:43:01  2  said was because it was in Belle Haven Park after

10:43:03  3  closing?

10:43:04  4      A.  Yes, sir.

10:43:05  5      Q.  And, the vehicle was a pickup truck?

10:43:08  6      A.  Yes, sir.

10:43:08  7      Q.  A Chevy Silverado?

10:43:11  8      A.  I believe that's correct, yes.

10:43:13  9      Q.  And this is just for clarification.  This is an

10:43:15 10  extended cab truck with four doors?

10:43:17 11      A.  Yes.

10:43:20 12      Q.  Now, you said the truck was parked in the far

10:43:22 13  northern part of the lot, correct?

10:43:26 14      A.  Yes, sir.

10:43:26 15      Q.  And almost in the back corner of the lot?

10:43:30 16      A.  Correct.

10:43:30 17      Q.  And you said you parked your car catty-corner to

10:43:34 18  his vehicle?

10:43:34 19      A.  His vehicle is parked here.  I think I came in at

10:43:37 20  an angle.  I believe I did.

10:43:40 21      Q.  How close did you bring your car to his car?

10:43:43 22      A.  Six, 10 feet, maybe.

10:43:45 23      Q.  Was it parked in such a way as to block him in to

10:43:51 24  the extent that you could?

10:43:54 25      A.  I may have.  I don't recall.

| | | |
|---|---|---|
| 10:43:55 | 1 | Q.  I mean, you didn't pull up and park next to him? |
| 10:43:58 | 2 | A.  No, sir. |
| 10:43:59 | 3 | Q.  And, you shined your spotlight towards his |
| 10:44:04 | 4 | vehicle? |
| 10:44:04 | 5 | A.  I believe I did. |
| 10:44:05 | 6 | Q.  And was his vehicle, was the cab facing towards |
| 10:44:07 | 7 | the water or out towards your car? |
| 10:44:09 | 8 | A.  Out towards the Parkway. |
| 10:44:12 | 9 | Q.  And, your vehicle, the front of your car was |
| 10:44:14 | 10 | towards the front of his car? |
| 10:44:16 | 11 | A.  Yes, sir. |
| 10:44:16 | 12 | Q.  With your spotlight towards his? |
| 10:44:19 | 13 | A.  I believe so, yes. |
| 10:44:20 | 14 | Q.  Did you have your blue lights on? |
| 10:44:22 | 15 | A.  I don't recall turning my emergency equipment on, |
| 10:44:26 | 16 | no, sir. |
| 10:44:26 | 17 | Q.  And when Officer Vinyard later came, where did he |
| 10:44:29 | 18 | park in relation to the two other vehicles? |
| 10:44:32 | 19 | A.  He was to -- from what I remember, to the right, |
| 10:44:37 | 20 | the passenger side of the pickup. |
| 10:44:40 | 21 | Q.  And, how far away from the pickup? |
| 10:44:43 | 22 | A.  Maybe the same distance.  I don't recall exactly. |
| 10:44:48 | 23 | Q.  And when you approached the pickup truck, you saw |
| 10:44:52 | 24 | that there were two occupants? |
| 10:44:53 | 25 | A.  Yes, sir. |

L. Freedman - Cross                                           42

10:44:53   1      Q.   And you saw they were in a state of undress?

10:44:56   2      A.   Yes, sir.

10:44:56   3      Q.   And you said you then opened the right rear door?

10:44:59   4      A.   I believe that's the one I opened, yes.

10:45:01   5      Q.   So you would have had to walk around to the far

10:45:04   6   side of the pickup, then?

10:45:06   7      A.   Yes, sir.

10:45:06   8      Q.   And you opened the right rear door.  You said you

10:45:09   9   immediately smelled an odor of marijuana?

10:45:12  10      A.   Correct.

10:45:13  11      Q.   And, that was coming from inside the vehicle or

10:45:15  12   at least that's what you believed?

10:45:17  13      A.   Yes.

10:45:18  14      Q.   And in response to that, that's why you ordered

10:45:24  15   the occupants out of the vehicle, correct?

10:45:26  16      A.   One of the reasons, yes.

10:45:28  17      Q.   What were the other reasons?

10:45:29  18      A.   The furtive movement that Mr. Turner was doing at

10:45:33  19   this time.  I didn't realize at that time that he had a

10:45:35  20   prosthetic leg that he was trying to I assume reattach.

10:45:42  21      Q.   And when you ordered them out, you subsequently

10:45:46  22   identified them by their licenses, correct?

10:45:49  23      A.   Yes, sir.

10:45:50  24      Q.   And according to your report at that point, you

10:45:53  25   detained them, right?

10:45:54   1       A.   Yes, sir.

10:45:55   2       Q.   And, the reason for that at that time you wanted

10:45:59   3   to search the vehicle for marijuana, right?

10:46:02   4       A.   For possible contraband in the vehicle, yes, sir.

10:46:06   5       Q.   Including marijuana, obviously --

10:46:08   6       A.   Yes.

10:46:09   7       Q.   -- based on the smell of marijuana?

10:46:10   8       A.   Yes, sir.

10:46:13   9       Q.   And, so they were detained, but they weren't

10:46:17   10  handcuffed at this point, right?

10:46:19   11      A.   I don't recall when I actually handcuffed him.

10:46:22   12  If I -- I know it was -- there was two of them versus

10:46:28   13  one of me, so I may have handcuffed them right away.  I

10:46:31   14  don't recall.

10:46:31   15      Q.   They weren't placed in police vehicles at that

10:46:34   16  point?

10:46:34   17      A.   No.

10:46:35   18      Q.   They were made to wait outside the truck while

10:46:39   19  you served?

10:46:40   20      A.   I did a quick cursory search, yes, sir.

10:46:44   21      Q.   And in that quick cursory search, you found the

10:46:47   22  Newport cigarette box?

10:46:48   23      A.   Yes, sir.

10:46:49   24      Q.   And that was on top of the center console?

10:46:52   25      A.   Yes.

10:46:53  1      Q.  And in that what you found to be marijuana

10:46:56  2  cigarettes?

10:46:56  3      A.  Yes.

10:47:00  4      Q.  And is this when Officer Vinyard arrived?

10:47:02  5      A.  No, I hadn't even put the -- from what I remember

10:47:06  6  the sequence of events, I don't think I said anything on

10:47:09  7  the air that point.  It wasn't until after I made the

10:47:14  8  radio transmission of that minor narcotics.

10:47:19  9      Q.  And how long after you made that transmission

10:47:22  10  that Officer Vinyard arrived?

10:47:26  11      A.  Anywhere between 10, 15 minutes.  He was coming

10:47:32  12  from D.C.

10:47:34  13      Q.  And, after you found that marijuana, well, at

10:47:39  14  some point after you found the marijuana, I guess you

10:47:42  15  don't -- strike that.

10:47:43  16          At some point during the search, you chose to

10:47:46  17  handcuff Mr. Turner?

10:47:47  18      A.  I believe so, yes.

10:47:49  19      Q.  And, you cuffed him behind his back?

10:47:51  20      A.  Yes, sir.

10:47:51  21      Q.  And, you knew about somewhere around this time

10:47:58  22  that he had a prosthetic leg?

10:48:01  23      A.  Yes, sir.

10:48:01  24      Q.  And, at some point, you placed him on the back of

10:48:06  25  Officer Vinyard's cruiser?

| | | |
|---|---|---|
| 10:48:08 | 1 | A.   After Officer Vinyard arrived, yes. |
| 10:48:11 | 2 | Q.   This was before you had retrieved the firearm |
| 10:48:14 | 3 | from the vehicle? |
| 10:48:15 | 4 | A.   Right. |
| 10:48:15 | 5 | Q.   Because Officer Vinyard was one of the people |
| 10:48:18 | 6 | that helped you find the firearm? |
| 10:48:20 | 7 | A.   Correct. |
| 10:48:21 | 8 | Q.   So, after Officer Vinyard got there and after you |
| 10:48:24 | 9 | found the firearm, by that point Mr. Turner was in the |
| 10:48:27 | 10 | back of the vehicle, correct? |
| 10:48:29 | 11 | A.   Once Officer Vinyard arrived on the scene, |
| 10:48:33 | 12 | because it was cold that night and I wanted to keep |
| 10:48:36 | 13 | Mr. Turner and Ms. Weeks separated, Mr. Turner was |
| 10:48:39 | 14 | placed in Officer Vinyard's cruiser. |
| 10:48:41 | 15 | Q.   So, it was before the search that revealed the |
| 10:48:44 | 16 | gun? |
| 10:48:44 | 17 | A.   Correct. |
| 10:48:45 | 18 | Q.   And, he was still cuffed at that time? |
| 10:48:47 | 19 | A.   Yes. |
| 10:48:47 | 20 | Q.   And he was still cuffed behind his back? |
| 10:48:50 | 21 | A.   Yes, sir. |
| 10:48:50 | 22 | Q.   And the door to the cruiser was closed? |
| 10:48:52 | 23 | A.   I believe so, yes, sir. |
| 10:48:54 | 24 | Q.   And, in fact, Officer Daugherty also arrived |
| 10:48:58 | 25 | sometime during this search as well? |

| | | |
|---|---|---|
| 10:49:02 | 1 | A.   He -- he arrived at some point, yes. |
| 10:49:06 | 2 | Q.   And, he had a police canine with him when he |
| 10:49:10 | 3 | arrived? |
| 10:49:10 | 4 | A.   Yes. |
| 10:49:10 | 5 | Q.   And there was also a Park Police helicopter |
| 10:49:14 | 6 | overhead? |
| 10:49:15 | 7 | A.   It had been there earlier before Officer Vinyard |
| 10:49:17 | 8 | got there. |
| 10:49:18 | 9 | Q.   And Park Police officer had been shining it's |
| 10:49:22 | 10 | lights down on the scene? |
| 10:49:23 | 11 | A.   Illuminating the area, yes, sir. |
| 10:49:26 | 12 | Q.   And, you testified that after the firearm was |
| 10:49:30 | 13 | found, you walked over and asked Mr. Turner if he had a |
| 10:49:33 | 14 | permit for the gun? |
| 10:49:34 | 15 | A.   Yes. |
| 10:49:35 | 16 | Q.   Now, you didn't Mirandize him prior to asking him |
| 10:49:37 | 17 | that question? |
| 10:49:38 | 18 | A.   No, I did not. |
| 10:49:39 | 19 | Q.   And he was still cuffed? |
| 10:49:40 | 20 | A.   Yes, sir. |
| 10:49:41 | 21 | Q.   And he was still in the back of the cruiser? |
| 10:49:43 | 22 | A.   Yes. |
| 10:49:43 | 23 | Q.   And, that's the only question that you asked? |
| 10:49:46 | 24 | A.   Yes. |
| 10:49:48 | 25 | Q.   You didn't do anything else to establish |

| 10:49:50 | 1 | ownership of the gun? |
| 10:49:51 | 2 | A.  Not that I recall, no. |
| 10:49:53 | 3 | Q.  You didn't, for example, ask if Ms. Weeks had a |
| 10:49:56 | 4 | permit for it? |
| 10:49:57 | 5 | A.  Not that I recall, no. |
| 10:49:59 | 6 | Q.  And, following his response to that question, you |
| 10:50:02 | 7 | arrested him for weapons offense, correct? |
| 10:50:05 | 8 | A.  In my mind, yes. |
| 10:50:07 | 9 | Q.  You didn't arrest Ms. Weeks for a weapons |
| 10:50:10 | 10 | offense? |
| 10:50:11 | 11 | A.  No. |
| 10:50:11 | 12 | THE COURT:  When you say in your mind, what |
| 10:50:13 | 13 | did you mean?  Did you say it out loud? |
| 10:50:15 | 14 | THE WITNESS:  Not that I recall, Your Honor. |
| 10:50:17 | 15 | BY MR. RICHMAN: |
| 10:50:17 | 16 | Q.  So, you had some basis for distinguishing him |
| 10:50:22 | 17 | from Ms. Weeks obviously? |
| 10:50:25 | 18 | A.  Yes. |
| 10:50:25 | 19 | Q.  And something about his response you took as an |
| 10:50:28 | 20 | acknowledgment that it was his gun, correct? |
| 10:50:30 | 21 | A.  Yes. |
| 10:50:30 | 22 | Q.  Because you didn't even ask Ms. Weeks whether she |
| 10:50:34 | 23 | had a permit? |
| 10:50:36 | 24 | A.  Concerning where I found the vehicle, the vehicle |
| 10:50:39 | 25 | was his, where the weapon was found and basically, his |

| | | |
|---|---|---|
| 10:50:43 | 1 | body language when I asked him that led me to believe |
| 10:50:47 | 2 | that it was his. |
| 10:50:48 | 3 | Q.  You don't recollect exactly what he said when you |
| 10:50:50 | 4 | asked the question, right? |
| 10:50:51 | 5 | A.  He shook his head no or said no and then his |
| 10:50:57 | 6 | shoulders kind of dropped and he sort of hung his head |
| 10:51:01 | 7 | down. |
| 10:51:01 | 8 | Q.  And you took that as an acknowledgment that was |
| 10:51:03 | 9 | his gun? |
| 10:51:03 | 10 | A.  I did. |
| 10:51:05 | 11 | Q.  And, now you testified earlier that you have |
| 10:51:13 | 12 | interactions with the public virtually every shift, |
| 10:51:16 | 13 | right? |
| 10:51:16 | 14 | A.  Yes, sir. |
| 10:51:16 | 15 | Q.  And you work, what four or five shifts a week? |
| 10:51:20 | 16 | A.  Typical is three one week and four the next. |
| 10:51:24 | 17 | Q.  In any event, it's been four months now since |
| 10:51:27 | 18 | this stop on January 9th, right? |
| 10:51:29 | 19 | A.  Yes, sir. |
| 10:51:30 | 20 | Q.  And, so you've done maybe a dozen or more shifts |
| 10:51:35 | 21 | a month? |
| 10:51:35 | 22 | A.  Yes, sir. |
| 10:51:36 | 23 | Q.  So you've 50 or so shifts since then? |
| 10:51:40 | 24 | A.  At least, yes, plus or minus. |
| 10:51:42 | 25 | Q.  You've had many, many interactions with the |

| 10:51:44 | 1 | public during all those shifts, correct? |
| 10:51:49 | 2 | A.  Yes, sir. |
| 10:51:50 | 3 | Q.  And sometime during the course of your job, |
| 10:51:52 | 4 | you're called to testify about your interactions, right? |
| 10:51:54 | 5 | A.  Yes. |
| 10:51:54 | 6 | Q.  And you have to do so under oath, right? |
| 10:51:56 | 7 | A.  Yes, sir. |
| 10:51:57 | 8 | Q.  And you have to be truthful? |
| 10:51:58 | 9 | A.  Yes, sir. |
| 10:51:59 | 10 | Q.  And complete and accurate? |
| 10:52:00 | 11 | A.  Yes, sir. |
| 10:52:01 | 12 | Q.  And, that's one of the reasons you write police |
| 10:52:04 | 13 | reports? |
| 10:52:05 | 14 | A.  It's true. |
| 10:52:07 | 15 | Q.  Because without the benefit of one of your |
| 10:52:10 | 16 | reports, you wouldn't be able to sit here today and |
| 10:52:13 | 17 | recite the exact conversation you had with a drunk |
| 10:52:16 | 18 | driver that you pulled over three or four or five months |
| 10:52:19 | 19 | ago, correct? |
| 10:52:20 | 20 | A.  Correct. |
| 10:52:20 | 21 | Q.  Or his exact performance on field sobriety tests? |
| 10:52:25 | 22 | A.  Yes. |
| 10:52:25 | 23 | Q.  You need your reports to do that, right? |
| 10:52:27 | 24 | A.  Yes, sir. |
| 10:52:28 | 25 | Q.  And, so it's important as part of your job that |

10:52:32   1   you have to make reports of all those interactions that

10:52:34   2   you have to the extent they're relevant to a case,

10:52:37   3   right?

10:52:37   4       A.  Yes, sir.

10:52:37   5       Q.  And, you try to make those accurate -- those

10:52:41   6   reports accurate and truthful --

10:52:43   7       A.  Yes, sir.

10:52:43   8       Q.  -- and thorough?

10:52:48   9           In this case, you did make a police report,

10:52:50  10   right?

10:52:50  11       A.  Yes, I did.

10:52:51  12       Q.  And, you reviewed it prior to your testimony?

10:52:55  13       A.  Yes, sir.

10:52:56  14       Q.  And you didn't mention anything about your

10:52:58  15   questioning of Mr. Turner, did you?

10:53:02  16       A.  If -- the only question I asked him was about the

10:53:06  17   permit.  And no, I did not put that in.

10:53:10  18       Q.  And, you swore to an affidavit in support of a

10:53:14  19   criminal complaint later that same day, didn't you,

10:53:17  20   against Mr. Turner?

10:53:21  21       A.  I believe I came back in later, yes.  I don't

10:53:24  22   remember exactly when I did it.

10:53:25  23       Q.  But, you did swear to an affidavit in support of

10:53:31  24   a criminal complaint?

10:53:32  25       A.  Yes.

10:53:32  1      Q.  And in that report, you didn't mention anything
10:53:34  2   about any pre-Miranda question you asked of Mr. Turner?
10:53:37  3      A.  Not that I recall, no.
10:53:38  4      Q.  And two months later, you testified in a grand
10:53:42  5   jury in the case for Mr. Turner, correct?
10:53:44  6      A.  That's correct.
10:53:44  7      Q.  And, in that testimony, you didn't mention
10:53:46  8   anything about your pre-Miranda question of Mr. Turner?
10:53:51  9      A.  I may have.  I don't recall the grand jury.
10:53:56 10      Q.  Would you like to review your testimony?  Would
10:53:58 11   that refresh your recollection as to whether you
10:54:00 12   mentioned that interaction?
10:54:03 13      A.  Yes, please.
10:54:05 14           MR. RICHMAN:  I'm handing up what I'm
10:54:08 15   marking as Defense Exhibit 1, and I have a copy I can
10:54:19 16   show Your Honor.
10:54:27 17      Q.  And I refer you to pages three to four where it
10:54:32 18   discusses your finding the firearm.
10:54:54 19           You didn't mention anything about your
10:54:55 20   pre-Miranda question to Mr. Turner in that testimony,
10:54:59 21   did you?
10:54:59 22      A.  No, I didn't.
10:55:00 23      Q.  And that was on March 24, 2009?
10:55:02 24      A.  Yes, sir.
10:55:04 25      Q.  So, the first time you advised anyone about that

10:55:09    1    conversation was in April of this year?

10:55:17    2        A.   I'm not sure when I --

10:55:21    3        Q.   It was after an issue had been raised by the

10:55:25    4    attorneys, correct?

10:55:26    5        A.   It's possible.  I don't recall.

10:55:27    6        Q.   As to whether or not you had any pre-Miranda

10:55:30    7    questioning of Mr. Turner?

10:55:33    8        A.   I see.

10:55:33    9        Q.   You don't have a basis to disagree with that, do

10:55:36   10    you?

10:55:36   11        A.   Not to my recollection, no.

10:55:43   12        Q.   So, without a report, you still believe you

10:55:47   13    can -- you recollect exactly the conversation you had

10:55:49   14    with Mr. Turner that night?

10:55:52   15        A.   Parts of it, yes, sir.

10:55:53   16        Q.   You don't recollect all of it?

10:55:55   17        A.   No, sir.

10:55:55   18        Q.   So, there could have been more?

10:55:58   19        A.   After he was in handcuffs and in the back of the

10:56:00   20    cruiser, no.  I knew I didn't want to ask him any more

10:56:04   21    questions because it would invoke Miranda.

10:56:12   22        Q.   Now, in the grand jury, you did testify about

10:56:14   23    seeing -- that Detective Monahan elicited from

10:56:18   24    Mr. Turner after he was Mirandized, correct?

10:56:20   25        A.   Yes, sir.



10:56:21   1       Q.   And you know he was Mirandized before those

10:56:23   2   statements because he signed the waiver as you said on

10:56:26   3   direct?

10:56:27   4       A.   Correct.

10:56:27   5       Q.   And from where you were watching those Miranda

10:56:32   6   warnings, you could see Mr. Turner and Detective

10:56:36   7   Monahan, right?

10:56:37   8       A.   Yes.

10:56:37   9       Q.   And Mr. Turner then could see you?

10:56:40  10       A.   If he turned the chair that he was sitting in,

10:56:45  11   it's bolted down and set to face pretty much one

10:56:49  12   direction, and I would have been at his back.

10:56:52  13       Q.   This was about two hours after the arrest?

10:56:55  14       A.   Approximately, yes, sir.

10:56:56  15       Q.   And, you had watched through the room where he

10:56:58  16   was during the time he was detained in there, correct?

10:57:02  17       A.   At different points in the morning, yes, sir.

10:57:06  18       Q.   And at the moment the Miranda warnings were read,

10:57:10  19   you were visible from where he was seated if he had

10:57:14  20   looked in the correct direction?

10:57:15  21       A.   It's possible.

10:57:16  22       Q.   And, he'd been in continuous custody of the Park

10:57:21  23   Police from the time of -- at Belle Haven Park until

10:57:24  24   this interview, right?

10:57:25  25       A.   Yes, sir.

| 10:57:25 | 1  | Q.  He hadn't made any phone calls? |
| 10:57:30 | 2  | A.  At that point, no. |
| 10:57:32 | 3  | Q.  Didn't have a lawyer present? |
| 10:57:34 | 4  | A.  No, sir. |
| 10:57:35 | 5  | Q.  And before Detective Monahan questioned |
| 10:57:43 | 6  | Mr. Turner, he had to be made aware of the facts, |
| 10:57:45 | 7  | correct? |
| 10:57:46 | 8  | A.  I may have shown Detective Monahan the suspected |
| 10:57:52 | 9  | narcotics and the weapon that I found. |
| 10:57:53 | 10 | Q.  And, you would have had to have told him where it |
| 10:57:57 | 11 | was found, right? |
| 10:57:58 | 12 | A.  I don't recall what I said to Detective Monahan. |
| 10:58:01 | 13 | Q.  Well, you must have told him that you had reason |
| 10:58:03 | 14 | to believe it was Mr. Turner as opposed to Ms. Weeks? |
| 10:58:08 | 15 | A.  I do not recall exactly what I told him. |
| 10:58:10 | 16 | Q.  Well, you didn't ask him to question Ms. Weeks, |
| 10:58:13 | 17 | did you? |
| 10:58:13 | 18 | A.  Ms. Weeks was not at the station. |
| 10:58:17 | 19 | Q.  Again, you didn't ask him to question her; is |
| 10:58:20 | 20 | that right? |
| 10:58:22 | 21 | A.  No, sir. |
| 10:58:22 | 22 | Q.  So, clearly you made it known to Detective |
| 10:58:26 | 23 | Monahan that it was your belief based on what you |
| 10:58:28 | 24 | learned at the stop that it was Mr. Turner's gun? |
| 10:58:31 | 25 | A.  I don't recall making a statement like that or |

10:58:33  1    anything to that effect.

10:58:41  2        Q.  And -- Court's indulgence briefly, Your Honor.

10:59:12  3            By the time of Detective Monahan's investigation,

10:59:15  4    you were aware that Mr. Turner had a felony conviction

10:59:20  5    from the 80s?

10:59:21  6        A.  I didn't recall exactly when I was made aware of

10:59:25  7    that.

10:59:25  8        Q.  Was -- was it your understanding that Detective

10:59:32  9    Monahan was doing an investigation for a misdemeanor

10:59:34  10   charge or a felony charge?

10:59:35  11       A.  I have no idea what Detective Monahan was --

10:59:40  12       Q.  In any event, the purpose of his interview was

10:59:43  13   simply to establish ownership of the firearm, correct?

10:59:49  14       A.  I think it was broader than just the weapon,

10:59:52  15   involving narcotics and everything else.

10:59:54  16       Q.  The point was to establish ownership, though?

10:59:56  17       A.  I'm not sure what Detective Monahan's point was.

11:00:00  18   We just --

11:00:03  19       Q.  Well, you had the weapon, correct?

11:00:05  20       A.  Yes, sir.

11:00:06  21       Q.  You had the suspected narcotics?

11:00:08  22       A.  Yes, sir.

11:00:09  23       Q.  The one thing you didn't have for a case was a

11:00:15  24   post-Miranda statement establishing ownership of those

11:00:18  25   items, correct?

11:00:19  1      A.  Correct.

11:00:19  2      Q.  So, that would have been the point of the

11:00:21  3  interview, correct?

11:00:22  4      A.  It may have been one of the points of the

11:00:24  5  interview, yes, sir.

11:00:34  6              MR. RICHMAN:  Nothing further, Your Honor.

11:00:37  7                      REDIRECT EXAMINATION

11:00:37  8  BY MR. BARKER:

11:00:46  9      Q.  Stepping back in time to your question to the

11:00:48 10  defendant at the car about the permit, were you

11:00:53 11  attempting to elicit ownership of the gun with that

11:00:57 12  statement?

11:00:57 13      A.  No, it was like an incident that I had several

11:01:02 14  years back where there was a gentleman on the Parkway

11:01:07 15  just further south of that area.  He happened to have a

11:01:10 16  weapon, and he also had a conceal/carry permit and he

11:01:14 17  was not arrested.

11:01:17 18      Q.  And then moving forward in time to the station

11:01:20 19  house when you were witnessing the Miranda warnings and

11:01:23 20  when you were in the room next to the interview room,

11:01:26 21  did you notice the defendant looking at you while he was

11:01:29 22  in the interview room and you were --

11:01:31 23      A.  Not that I recall.

11:01:32 24      Q.  I'm sorry.

11:01:33 25      A.  Not that I recall.

| | | |
|---|---|---|
| 11:01:34 | 1 | Q.  And then turning to your report, is your report |
| 11:01:39 | 2 | intended to be a general summary of your observations or |
| 11:01:42 | 3 | include every specific detail? |
| 11:01:44 | 4 | A.  General summary with as -- you know, as much |
| 11:01:49 | 5 | pertinent details as possible. |
| 11:01:50 | 6 | Q.  Why didn't you mention the pre-Miranda question |
| 11:01:54 | 7 | about the permit in your report? |
| 11:01:57 | 8 | A.  At that point, I didn't feel it was necessary -- |
| 11:02:01 | 9 | subsequently necessary. |
| 11:02:04 | 10 | Q.  And then moving on to the complaint and the grand |
| 11:02:08 | 11 | jury, was the defendant charged with possession of a |
| 11:02:11 | 12 | firearm in a park in violation of the park relations or |
| 11:02:15 | 13 | possession of a firearm by a felon in violation of the |
| 11:02:19 | 14 | U.S. Code? |
| 11:02:21 | 15 | A.  Possession of a firearm by a felon later on. |
| 11:02:26 | 16 | Q.  Is having a permit an element -- or lacking a |
| 11:02:28 | 17 | permit an element of the federal violation? |
| 11:02:30 | 18 | A.  Yes. |
| 11:02:30 | 19 | Q.  I'm sorry.  Is -- |
| 11:02:31 | 20 | A.  I believe it is, yes. |
| 11:02:35 | 21 | Q.  Well, let me rephrase that.  In your complaint, |
| 11:02:41 | 22 | did you attest to whether the defendant had a permit for |
| 11:02:44 | 23 | the weapon at all? |
| 11:02:45 | 24 | A.  No. |
| 11:02:46 | 25 | Q.  And, did you get into that with the grand jury? |

11:02:50   1       A.   Somewhat, I believe.

11:02:53   2       Q.   At the -- would it refresh -- would looking at

11:02:57   3   the grand jury testimony refresh your testimony about

11:03:00   4   whether a permit was discussed?  Did you mention a

11:03:26   5   permit in the grand jury?

11:03:26   6       A.   No.

11:03:28   7       Q.   Is lacking a permit an element of the federal

11:03:32   8   charge, the charge under violation of the U.S. Code?

11:03:35   9       A.   No.

11:03:37   10      Q.   And in the complaint, you mentioned the

11:03:40   11  defendant's confession to possessing the gun, am I

11:03:43   12  correct?

11:03:43   13      A.   That he made to Detective Monahan, yes, sir.

11:03:45   14      Q.   And you mentioned that same confession in the

11:03:48   15  grand jury?

11:03:48   16      A.   Yes.

11:03:50   17            MR. BARKER:  Court's indulgence.  No further

11:03:54   18  questions, Your Honor.

11:03:57   19            THE COURT:  You can step down.  Thank you.

11:03:59   20            MR. RICHMAN:  Would the Court allow any

11:04:00   21  additional recross just within the area that the

11:04:03   22  government raised?

11:04:05   23            THE COURT:  Was there any new matter?

11:04:08   24            MR. RICHMAN:  Well, it had to do with the

11:04:11   25  scope of the report that they brought up.

| | | |
|---|---|---|
| 11:04:13 | 1 | THE COURT:  No.  Thank you.  You can step |
| 11:04:15 | 2 | down. |
| 11:04:15 | 3 | (Thereupon, the witness withdrew from the |
| 11:04:22 | 4 | stand.) |
| 11:04:22 | 5 | MR. BARKER:  The government has no further |
| 11:04:23 | 6 | witnesses at this time. |
| 11:04:24 | 7 | THE COURT:  All right. |
| 11:04:35 | 8 | MS. AHMAD:  Your Honor, the government would |
| 11:04:36 | 9 | call Mr. Turner.  I'm sorry, the defense will call |
| 11:04:40 | 10 | Mr. Turner. |
| 11:04:54 | 11 | THEREUPON, SHERMAN ALAN TURNER, having been |
| 11:05:02 | 12 | duly sworn, testified as follows: |
| 11:05:02 | 13 | THE WITNESS:  I do. |
| 11:05:07 | 14 | DIRECT EXAMINATION |
| 11:05:07 | 15 | BY MS. AHMAD: |
| 11:05:15 | 16 | Q.  Could you please state your name for the record. |
| 11:05:17 | 17 | A.  My name is Sherman Alan Turner. |
| 11:05:20 | 18 | Q.  Mr. Turner, I'd like to ask you some questions |
| 11:05:22 | 19 | about how you came to be arrested on January 9th.  Can |
| 11:05:26 | 20 | you please tell the Court what Officer Freedman told you |
| 11:05:29 | 21 | to do when she opened the back door of your truck? |
| 11:05:35 | 22 | A.  When Officer Freedman approached the truck? |
| 11:05:38 | 23 | Q.  Yes. |
| 11:05:42 | 24 | A.  She didn't tell me to do anything.  What she did |
| 11:05:45 | 25 | was she opened the door and she seemed as though she was |

11:05:53  1    offended by what she saw which was the female that was

11:05:57  2    with me on the stages of undress.

11:06:03  3        Q.  Did she at any point tell you to exit the

11:06:06  4    vehicle?

11:06:06  5        A.  She told me to exit the vehicle after she told

11:06:12  6    her to get dressed and after she looked into the front

11:06:16  7    seat of the vehicle.

11:06:19  8        Q.  And what did she say to you after she looked into

11:06:21  9    the front seat of the vehicle?

11:06:23  10       A.  What she said was -- well, what she first opened

11:06:27  11   the door, again, she seemed as though she was appalled

11:06:32  12   by what she saw or offended by what she saw.  And again

11:06:36  13   it was the female under the stages of undress.

11:06:39  14            And she said, I don't believe this.  You have --

11:06:46  15   I don't believe this.  And then she went on to say, I

11:06:49  16   see you have an open container of alcohol in the

11:06:52  17   vehicle.  What else would I find if I searched, any

11:06:55  18   marijuana?  So I said, Miss, I don't smoke.

11:06:58  19            She shined the light in my eyes.  She said, why

11:07:01  20   your eyes so red and I said I'm tired, I guess.

11:07:06  21            And, she told the lady to get dressed.  Put your

11:07:11  22   hands where I could see them.  I put my hands up on

11:07:16  23   the back seat of the truck.  And she looked in the

11:07:21  24   front.  She picked up the alcohol.  She picked up the

11:07:24  25   cigarettes.  And then she said I guess this isn't yours

11:07:27  1   either.  And she showed me a pack of cigarettes.

11:07:30  2        I said, Miss, I don't smoke for the second time.

11:07:34  3   She turned to the young lady and said, not only does he

11:07:38  4   not -- not only is he going to disrespect you in a

11:07:41  5   public place like this, he has the audacity to pin this

11:07:45  6   on you now.  You are some catch, Mister, is what she

11:07:50  7   said to me.  I need you to step out of the car and go

11:07:53  8   over there and sit on the curb.

11:07:55  9        Again the lady was getting dressed.  I said, Miss

11:07:59  10  I have a prosthetic.  I can't sit on the curb.  So she

11:08:04  11  said okay, well stand here at the back of the truck.  So

11:08:06  12  I stood at the back of the truck.

11:08:10  13  Q.  When Officer Freedman asked you is this box of

11:08:14  14  cigarettes not yours either, did she ask the female the

11:08:16  15  same question?

11:08:17  16  A.  No.

11:08:17  17  Q.  Did she ask the female any questions about the

11:08:20  18  box of cigarettes that contained marijuana?

11:08:22  19  A.  No.

11:08:22  20  Q.  At any point during the search of your vehicle,

11:08:28  21  did you notice a helicopter in the area?

11:08:30  22  A.  Yes.  When she first pulled up, she pulled up,

11:08:35  23  she opened the door, she said what she said and then a

11:08:38  24  helicopter flew overhead and he shined the light down

11:08:42  25  and illuminated the park right there.

11:08:46  1          Then when the other cop came, when the other

11:08:49  2    officer came, the helicopter took off.

11:08:55  3       Q.   Now at any point were you handcuffed?

11:09:00  4       A.   I was handcuffed after the second officer came I

11:09:04  5    believe.

11:09:07  6       Q.   And when the second officer came, what did he do

11:09:11  7    with you?

11:09:12  8       A.   He escorted me to his cruiser and put me in the

11:09:16  9    back seat.

11:09:16  10      Q.   And you were still handcuffed at that time?  Did

11:09:20  11   he put his hands on you and take you into the cruiser?

11:09:22  12      A.   Yes, he assisted me by again I'm -- I don't like

11:09:28  13   to say disabled.  I have limited mobility.  I'm not

11:09:32  14   disabled.  I'm not handicapped.  I have limited mobility

11:09:36  15   because I have lost one of my legs.

11:09:41  16      Q.   When you were sitting in the back of the police

11:09:43  17   cruiser, could you see your truck?

11:09:46  18      A.   Yes.

11:09:47  19      Q.   About how far away were you from your truck when

11:09:51  20   you were sitting in the back of the cruiser?

11:09:52  21      A.   Probably the distance from here to that desk

11:09:56  22   right there, probably about ten, 12 feet.

11:09:58  23      Q.   And, when you say the desk there, you're

11:10:01  24   referring to the desk that the government's counsel is

11:10:04  25   sitting at?

| | | |
|---|---|---|
| 11:10:04 | 1 | A.  Yes. |
| 11:10:07 | 2 | THE COURT:  Pull the mike a little closer to |
| 11:10:10 | 3 | you if you would.  Thanks. |
| 11:10:14 | 4 | BY MS. AHMAD: |
| 11:10:14 | 5 | Q.  And were lights still shined on your truck? |
| 11:10:17 | 6 | A.  Yes, I think she had the -- she had her high |
| 11:10:23 | 7 | beams on. |
| 11:10:25 | 8 | When the female officer, Ms. -- I don't know her |
| 11:10:28 | 9 | name, Ms. Freedman.  My truck was backed in.  When she |
| 11:10:32 | 10 | pulled in, she put her lights on the driver's side door. |
| 11:10:37 | 11 | The other officer pulled in and he pulled like |
| 11:10:40 | 12 | this, catty-corner.  So one car was here and one car was |
| 11:10:45 | 13 | here. |
| 11:10:46 | 14 | Q.  So the lights of at least one of those patrol |
| 11:10:49 | 15 | cars was still shining on your truck? |
| 11:10:51 | 16 | A.  The lights of both of the vehicles were shining |
| 11:10:53 | 17 | on my truck. |
| 11:10:54 | 18 | Q.  So you could view the truck pretty clearly? |
| 11:10:56 | 19 | A.  Yes. |
| 11:10:57 | 20 | Q.  Could you also hear some of the officer's |
| 11:11:01 | 21 | conversation? |
| 11:11:01 | 22 | A.  Not to each other, not Ms. Freedman and the other |
| 11:11:05 | 23 | officer, the second guy that came. |
| 11:11:10 | 24 | Q.  At any point did you see an officer arrive with a |
| 11:11:13 | 25 | drug sniffing dog? |

11:11:15    1        A.   Yes, he came after -- after the two officers

11:11:21    2   searched my vehicle, the dogs came, the canine officer

11:11:28    3   came and he put the dog in my truck.  And the dog went

11:11:31    4   in the driver side and out the passenger side.  So he

11:11:38    5   grabbed the dog, put him back in and he started patting

11:11:39    6   here, patting here.  To me the dog looked confused and

11:11:47    7   he went and put the dog away.

11:11:48    8        Q.   What happened after the dog was taken away?

11:11:50    9        A.   After the dog was taken away, the lady, the

11:11:53   10   female officer she came over to me, and she said that I

11:11:57   11   was being -- she said that you're going to be charged

11:12:01   12   with being in a park after dark, lewd behavior or --

11:12:06   13   open container of alcohol and marijuana.

11:12:11   14        And I said, Miss, I don't smoke, Miss.  And then

11:12:15   15   the canine officer came back and went to the bed of my

11:12:18   16   truck, the back tailgate.  He opened the tailgate.  He

11:12:24   17   asked me what type of work I do.  I'm a licensed

11:12:27   18   electrician.  So I told him I'm an electrician.  And he

11:12:31   19   said, all these tools yours?  I said yeah.  He said, do

11:12:35   20   you have a receipt for them?  I said, I don't have a

11:12:37   21   receipt, but they're mine.

11:12:39   22        Then he went from the back of my tailgate, he

11:12:43   23   shut the tailgate and went to the back seat of my truck.

11:12:48   24        Q.   You mentioned that before he went to the

11:12:52   25   tailgate, the dog had gone through the truck?

11:12:54   1      A.   Yes.

11:12:55   2      Q.   Did the dog go into the bed of the truck?

11:12:57   3      A.   The tail -- the bed, no, no, because I have a --

11:13:02   4   my tailgate is covered.  It's covered and it was closed.

11:13:06   5   The dog never got into that.

11:13:13   6      Q.   So what happened after the canine officer

11:13:18   7   questioned you about the tools and went to the passenger

11:13:20   8   part of the truck?

11:13:21   9      A.   Then he went into the back seat.  I have an

11:13:24  10   extended cab.  It's a four door truck.  He went to the

11:13:27  11   back seat on the passenger side -- on the driver's side.

11:13:35  12   He went to the back seat.  And if you lift the bottom

11:13:37  13   portion of the seat, then the back portion of the seat

11:13:40  14   will fall down.

11:13:41  15           So, he lifted that, fold it down, look in the

11:13:45  16   back.  And from where I could see in the police cruiser,

11:13:49  17   he took the cane out.  And I saw him walking back to his

11:13:53  18   car with my cane.

11:13:55  19           Again, Ms. -- the other lady was standing telling

11:14:00  20   me what I was going to be charged with.  And the officer

11:14:04  21   came back.  He slid the front seat of the passenger side

11:14:07  22   up.  He went to the passenger side, lift the back seat,

11:14:13  23   slide the front seat up, went under it, then he slide

11:14:17  24   the driver seat up under it and he called the other

11:14:20  25   officers back to the truck.

S. Turner - Direct                                                    66

11:14:23   1        Q.   And what happened after he called the other

11:14:26   2    officers back to the truck?

11:14:28   3        A.   After they -- after he called the other officers

11:14:31   4    back to the truck, the female officer came over to me.

11:14:37   5    I was sitting in the police car.  The window was down.

11:14:40   6    And she said what kind of gun is that?

11:14:49   7        Q.   She asked you what kind of gun is that?  What was

11:14:51   8    your response?

11:14:52   9        A.   I told her it was a Glock, a Glock 26.

11:14:56  10        Q.   Did she ask you any other questions?

11:14:58  11        A.   Yes, she asked me -- she said -- and it's yours,

11:15:04  12    right, because she had already kind of accused me of

11:15:07  13    trying to put the cigarettes on the girl or whatever.

11:15:10  14    She said, and this is yours, right?  And I say, yeah,

11:15:15  15    it's mine.  And she say, do you have a permit for it?  I

11:15:18  16    say, man, whatever.  I just was kind of flippant at that

11:15:23  17    point because I was mad.

11:15:25  18        Q.   Before she came over to the vehicle to ask you

11:15:28  19    these questions, did you notice a change in the tone at

11:15:32  20    the scene?

11:15:35  21        A.   A change of -- before she asked me those

11:15:38  22    questions?

11:15:38  23        Q.   Yes.

11:15:40  24        A.   They were a little bit -- yeah, because she said

11:15:43  25    something like that, where did you see that or where --

11:15:47   1   the guy obviously called her back and pointed it to her.

11:15:51   2   The canine officer came back and pointed it to her, and

11:15:54   3   she said something like how did we miss that or

11:15:58   4   something to that effect.

11:15:59   5       Q.   She didn't say to you.  She said that to the

11:16:02   6   canine officer?

11:16:02   7       A.   No, she was talking to them.  Again they were

11:16:06   8   only from here to you away from me and all four doors of

11:16:09   9   my truck was open and my windows was down in the police

11:16:12  10   car.

11:16:13  11       Q.   So, after she asked you about the gun, she walked

11:16:16  12   away?

11:16:17  13       A.   Yeah, she walked back over to the other officers.

11:16:24  14   I don't remember who removed it from the -- from the

11:16:28  15   car.  I really don't know who removed it from the car or

11:16:31  16   from my truck, but the lady came back and asked me.  She

11:16:35  17   said, Mr. Turner, have you ever been convicted of a

11:16:40  18   felony?  And I said yeah, back in 1983-84, like 20 years

11:16:47  19   ago.

11:16:47  20           And she said okay.  And she went over and then it

11:16:51  21   was -- they were more jubilant like -- I don't know

11:16:56  22   exactly what they said, but, you know, I can't quote her

11:17:00  23   verbatim what she said, but it was -- it seemed to me

11:17:03  24   like they were jubilant.

11:17:06  25       Q.   What was it that they did that made you think

11:17:09  1    that they were jubilant?

11:17:10  2        A.  Like good catch or like yeah or -- a statement in

11:17:15  3    reference to that.

11:17:17  4        Q.  And, during that questioning, you were still

11:17:19  5    sitting in the back seat of the cruiser?

11:17:20  6        A.  Yes.

11:17:21  7        Q.  And your hands were still cuffed?

11:17:23  8        A.  Yes.

11:17:23  9        Q.  They were cuffed behind your back?

11:17:26  10       A.  Yes.

11:17:26  11       Q.  And in addition to Officer Freedman, the two

11:17:29  12   other male officers were still present?

11:17:31  13       A.  Yes.

11:17:36  14       Q.  When you returned to the police station or --

11:17:38  15   excuse me.  When you were first taken to the police

11:17:42  16   station, where did they put you?

11:17:43  17       A.  They put me in like a booking holding area.  It

11:17:48  18   wasn't in a cell or anything like that.  It was just

11:17:51  19   bench and a booking area.

11:17:54  20       Q.  You were sitting on a bench?

11:17:57  21       A.  Yes.

11:18:01  22            MS. AHMAD:  Court's indulgence.

11:18:22  23   BY MS. AHMAD:

11:18:22  24       Q.  While you were sitting in that room, did you see

11:18:24  25   Officer Freedman at any point?

11:18:26   1        A.   The female officer?

11:18:29   2        Q.   Yes, the female officer.

11:18:33   3        A.   The room was set up if I was sitting here, the

11:18:36   4   door, the entrance door here.  It was like a room.  I

11:18:40   5   don't know what kind of room it was, whether they -- I

11:18:44   6   would think that's where they stored the weapons or

11:18:46   7   whatever.  I don't really know.

11:18:48   8        Then there was a room directly ahead from me.

11:18:51   9   And over here, it was a cell.

11:18:53  10        The officer kept -- she came out of here and went

11:18:56  11   into that room, back and forth.  She went a couple of

11:18:59  12   times, a couple officers did, actually.

11:19:01  13        I don't know if she was -- I don't know what she

11:19:05  14   was doing.

11:19:05  15        Q.   And later a male officer came out to interview

11:19:08  16   you, correct?

11:19:09  17        A.   Yes.

11:19:11  18        Q.   And, did that male officer come out of the

11:19:13  19   same -- did you see that male officer come out of the

11:19:19  20   same room that the female officer kept walking in and

11:19:22  21   out of?

11:19:23  22        A.   He came out of the main portion of the building I

11:19:26  23   would say.  If I was in booking, whatever -- excuse me,

11:19:29  24   whatever offices or whatever they do back there is where

11:19:32  25   he came out of.

| | | |
|---|---|---|
| 11:19:33 | 1 | Q.  And, did you ever see the female officer go in |
| 11:19:36 | 2 | and out of that room? |
| 11:19:38 | 3 | A.  Yes. |
| 11:19:40 | 4 | Q.  Now, when that male officer interviewed you, he |
| 11:19:44 | 5 | read you your Miranda rights, correct? |
| 11:19:46 | 6 | A.  Yes. |
| 11:19:46 | 7 | Q.  And, you waived them and you agreed to answer his |
| 11:19:50 | 8 | questions? |
| 11:19:50 | 9 | A.  Yes, I did. |
| 11:19:51 | 10 | MS. AHMAD:  I have no further questions. |
| 11:19:58 | 11 | CROSS-EXAMINATION |
| 11:19:58 | 12 | BY MR. BARKER: |
| 11:20:17 | 13 | Q.  When Officer Freedman came to talk to you in the |
| 11:20:20 | 14 | police cruiser to ask you about the permit, why did you |
| 11:20:26 | 15 | think she was coming to talk to you? |
| 11:20:28 | 16 | A.  Why did I think she was coming to -- she walked |
| 11:20:31 | 17 | up to the window of the vehicle.  She walked up to the |
| 11:20:36 | 18 | window of the vehicle and she said something to me.  She |
| 11:20:38 | 19 | said, what kind of gun is that. |
| 11:20:40 | 20 | Q.  Did she bring the gun with her or leave it in the |
| 11:20:43 | 21 | truck? |
| 11:20:43 | 22 | A.  No, no. |
| 11:20:45 | 23 | Q.  And, it's your testimony that you told her that |
| 11:20:48 | 24 | the gun was yours in response to her questions? |
| 11:20:50 | 25 | A.  No, but I told her -- she asked me what kind of |

11:20:53  1   gun it was and I said it was a Glock 26.

11:20:56  2       Q.  And you knew that because it was your gun?

11:20:58  3       A.  I knew that because -- yes.

11:21:03  4       Q.  And, did you tell her that you didn't have a

11:21:06  5   permit for the gun?

11:21:08  6       A.  I didn't answer that question at all.

11:21:11  7       Q.  You then got dejected or slumped?

11:21:17  8       A.  I won't say that.  I just say whatever.  She

11:21:19  9   asked me three questions.  The first question she asked

11:21:22 10   me was what kind of gun is that and I told her it was a

11:21:25 11   Glock 26.  I said, it's a Glock, a Glock 26, in that

11:21:30 12   manner.

11:21:31 13       And then she said, and I guess that isn't yours

11:21:36 14   either.  And so I say yeah, yeah.  And then she said is

11:21:42 15   it registered?  Do you have a permit for it?  And I

11:21:45 16   said, man, whatever.  And she walked away.

11:21:48 17       Q.  And, you were truthful with her throughout that

11:21:51 18   interaction?

11:21:52 19       A.  Yes.

11:21:52 20       Q.  So the gun was yours?

11:21:53 21       A.  Yes.

11:21:53 22       Q.  You possessed it?

11:21:54 23       A.  It was in my truck, yes.  I possessed it.

11:21:59 24           MS. AHMAD:  Your Honor, I would object to

11:22:01 25   any questions about his ownership of the gun.  I do

S. Turner - Cross

11:22:04  1  think that questioning about what he said about the gun

11:22:07  2  at that point is appropriate.  But I don't think that

11:22:10  3  it's necessary in order to answer the questions that are

11:22:13  4  presented today to talk about whether he actually owned

11:22:15  5  the gun.

11:22:16  6        MR. BARKER:  I think it goes to his

11:22:18  7  truthfulness, Your Honor.

11:22:19  8        THE COURT:  Objection sustained.

11:22:22  9  BY MR. BARKER:

11:22:23  10    Q.  Let's turn to your interview at the police

11:22:25  11  station by Detective Monahan.  You said that you told

11:22:28  12  him you were convicted in what year?

11:22:31  13    A.  1984.

11:22:33  14    Q.  What were you convicted of?

11:22:34  15    A.  I was convicted of armed robbery.

11:22:39  16    Q.  And, you discussed during that interview your job

11:22:41  17  as an electrician; is that right?

11:22:43  18    A.  Yes.

11:22:44  19    Q.  You discussed your prior Army service; is that

11:22:49  20  right?

11:22:49  21    A.  Yes.

11:22:49  22    Q.  You discussed your prior time in law enforcement;

11:22:51  23  is that right?

11:22:52  24    A.  Yes, brief as it was.

11:22:54  25    Q.  You discussed your prosthetic leg for a good

| | | |
|---|---|---|
| 11:22:57 | 1 | deal; is that right? |
| 11:22:58 | 2 | A.  He asked me.  He questioned me.  It wasn't like I |
| 11:23:01 | 3 | was volunteering this information.  He engaged in a |
| 11:23:05 | 4 | conversation and asked me, how did you lose your leg and |
| 11:23:07 | 5 | what did you do before you -- you know, like that.  It |
| 11:23:10 | 6 | wasn't like I was just telling him. |
| 11:23:13 | 7 | Q.  You discussed that you had children and |
| 11:23:16 | 8 | stepchildren; is that right? |
| 11:23:17 | 9 | A.  Yes. |
| 11:23:19 | 10 | Q.  Now, Officer Freedman didn't ask you any |
| 11:23:21 | 11 | questions after you were Mirandized during that |
| 11:23:24 | 12 | interview, did she? |
| 11:23:25 | 13 | A.  No. |
| 11:23:25 | 14 | Q.  And she wasn't in the room, was she? |
| 11:23:27 | 15 | A.  I never saw her again.  After -- after he took |
| 11:23:31 | 16 | the cuffs off me and walked me over to the table to |
| 11:23:36 | 17 | interview me or whatever, I never saw that lady again |
| 11:23:39 | 18 | until today. |
| 11:23:41 | 19 | Q.  Well, with the -- I think no further questions, |
| 11:23:45 | 20 | Your Honor. |
| 11:23:49 | 21 | MS. AHMAD:  Your Honor, I just have one more |
| 11:23:52 | 22 | question. |
| 11:23:52 | 23 | THE COURT:  All right. |
| 11:23:53 | 24 | REDIRECT EXAMINATION |
| 11:23:53 | 25 | BY MS. AHMAD: |

| | | |
|---|---|---|
| 11:23:54 | 1 | Q.  To the extent that during your interview with the |
| 11:23:57 | 2 | male officer to the extent that you made statements |
| 11:24:00 | 3 | about the gun, they were in response to questioning, |
| 11:24:04 | 4 | right? |
| 11:24:04 | 5 | A.  Yes. |
| 11:24:05 | 6 | MS. AHMAD:  No further questions. |
| 11:24:09 | 7 | THE COURT:  You can step down, sir.  Thank |
| 11:24:11 | 8 | you. |
| 11:24:12 | 9 | (Thereupon, the witness withdrew from the |
| 11:24:33 | 10 | stand.) |
| 11:24:33 | 11 | MR. RICHMAN:  Your Honor, defense rests.  We |
| 11:24:35 | 12 | do have argument. |
| 11:24:36 | 13 | THE COURT:  All right. |
| 11:24:41 | 14 | MR. RICHMAN:  Your Honor, first of all, with |
| 11:24:42 | 15 | respect to the facts, we would submit that the Court |
| 11:24:44 | 16 | should find the following facts. |
| 11:24:47 | 17 | First, that at the roadside when Mr. Turner |
| 11:24:52 | 18 | was first placed in the back of the police car, that he |
| 11:24:56 | 19 | was in custody.  He was handcuffed with his hands behind |
| 11:25:04 | 20 | his back and placed in the back of a police cruiser. |
| 11:25:07 | 21 | The test under the cases is whether a |
| 11:25:11 | 22 | reasonable person would have felt he was not at liberty |
| 11:25:14 | 23 | to terminate the interrogation and leave.  That's from |
| 11:25:17 | 24 | *Thompson*, a case cited in the briefs. |
| 11:25:20 | 25 | This is not just an ordinary traffic stop |

| | | |
|---|---|---|
| 11:25:24 | 1 | where a person is sitting in their own car or even |
| 11:25:28 | 2 | standing near to their own car being asked a question by |
| 11:25:32 | 3 | law enforcement. |
| 11:25:32 | 4 | This is the classic straight from the movies |
| 11:25:35 | 5 | or TV show version of the indicia of being under arrest, |
| 11:25:43 | 6 | being cuffed with your hands behind your back in the |
| 11:25:46 | 7 | back of a police cruiser. |
| 11:25:47 | 8 | So, the government cites no cases saying |
| 11:25:51 | 9 | that that does not constitute custody.  We'd submit it's |
| 11:25:57 | 10 | a clear case of custody.  A reasonable person would not |
| 11:25:59 | 11 | have felt that they could just get up out of that police |
| 11:26:03 | 12 | car and leave. |
| 11:26:04 | 13 | So, that's the first fact we'd submit the |
| 11:26:09 | 14 | Court should find that there was custody at that time |
| 11:26:11 | 15 | when he was cuffed in the back of the police car. |
| 11:26:13 | 16 | The second fact is that when Officer |
| 11:26:16 | 17 | Freedman asked him -- questioned him and whether that |
| 11:26:19 | 18 | was one question or multiple questions, that that |
| 11:26:21 | 19 | constituted interrogation. |
| 11:26:23 | 20 | Again, the test under the cases from *Rhode* |
| 11:26:26 | 21 | *Island versus Innis* is whether there -- what the officer |
| 11:26:29 | 22 | did, whether the officer should have known what the |
| 11:26:34 | 23 | officer did was quote "reasonably likely to elicit an |
| 11:26:38 | 24 | incriminating response". |
| 11:26:39 | 25 | Now, she said that the purpose of her |

| | | |
|---|---|---|
| 11:26:41 | 1 | questioning was because it might make the difference |
| 11:26:45 | 2 | between a summons and an arrest, for example.  That's |
| 11:26:48 | 3 | really besides the point. |
| 11:26:49 | 4 | The issue is she essentially asked him, even |
| 11:26:51 | 5 | if you take it just for a question, just a simple |
| 11:26:54 | 6 | question about a permit, it was whether he was |
| 11:26:57 | 7 | committing a crime. |
| 11:26:59 | 8 | I mean, that's what she asked.  In her view, |
| 11:27:01 | 9 | it's a crime if you don't have a permit, and she asked |
| 11:27:04 | 10 | him whether he had one. |
| 11:27:06 | 11 | That was a question are you committing a |
| 11:27:10 | 12 | crime right now.  And she asked that of him while he was |
| 11:27:13 | 13 | in custody because he was cuffed in the back of the |
| 11:27:16 | 14 | cruiser. |
| 11:27:16 | 15 | So, we would submit that that constitutes |
| 11:27:19 | 16 | interrogation and that's true whether you believe her |
| 11:27:21 | 17 | version of the facts or it's just that one question |
| 11:27:23 | 18 | about a permit or Mr. Turner's version of the facts |
| 11:27:26 | 19 | where he says there were at least three questions, what |
| 11:27:28 | 20 | kind of gun is it?  It's yours, isn't it?  And, do you |
| 11:27:33 | 21 | have a permit for it?  Those are the three questions |
| 11:27:35 | 22 | that he says were asked. |
| 11:27:36 | 23 | And as I say it should be found to be |
| 11:27:41 | 24 | interrogation either way.  But I submit the Court should |
| 11:27:43 | 25 | find Mr. Turner's version of that conversation more |

| | | |
|---|---|---|
| 11:27:47 | 1 | credible. |
| 11:27:47 | 2 | First, her version simply doesn't ring true |
| 11:27:53 | 3 | to me at least that a person -- that an officer walks |
| 11:27:56 | 4 | up, just asks a six or 7-word question, gets a shrug for |
| 11:28:01 | 5 | an answer and walks away.  There is no other direction |
| 11:28:04 | 6 | and that's all that occurs.  It just doesn't -- doesn't |
| 11:28:08 | 7 | ring true at least to me. |
| 11:28:09 | 8 | But besides that, he's the person of these |
| 11:28:13 | 9 | two people who is more likely to remember it accurately. |
| 11:28:17 | 10 | First of all, she said she wasn't even sure, |
| 11:28:19 | 11 | because she didn't have a report.  She wasn't even sure |
| 11:28:21 | 12 | if that's what the interaction was and she said there |
| 11:28:23 | 13 | may have been more to it. |
| 11:28:24 | 14 | For her, this is something she does every |
| 11:28:27 | 15 | day, day in and day out for ten years.  And she's |
| 11:28:29 | 16 | worked, you know, 50 or so shifts since this incident |
| 11:28:33 | 17 | yet she didn't write anything down about this |
| 11:28:37 | 18 | questioning at the time.  She didn't write it later that |
| 11:28:39 | 19 | day when she did her affidavit.  She didn't talk about |
| 11:28:41 | 20 | it a couple months after in the grand jury. |
| 11:28:44 | 21 | It didn't come out from her until we had |
| 11:28:46 | 22 | filed a motion asserting that there was some pre-Miranda |
| 11:28:49 | 23 | questioning. |
| 11:28:50 | 24 | In light of that, she has nothing to refresh |
| 11:28:52 | 25 | her recollection.  She is just going back to what she |

| | | |
|---|---|---|
| 11:28:55 | 1 | now recalls without any way to refresh her recollection |
| 11:28:58 | 2 | about something she did during a shift several months |
| 11:29:02 | 3 | ago. |
| 11:29:02 | 4 | For Mr. Turner, of course, it's a key moment |
| 11:29:05 | 5 | in his life when this is occurring.  It's not something |
| 11:29:09 | 6 | that happens to him every day.  He's in the process of |
| 11:29:11 | 7 | being arrested with severe consequences potentially. |
| 11:29:15 | 8 | So, clearly if there's two people their |
| 11:29:18 | 9 | recollection of facts isn't directly contradictory.  His |
| 11:29:22 | 10 | just has more meat on it.  He's the one that would be |
| 11:29:24 | 11 | more likely to remember it clearly, and he does have a |
| 11:29:27 | 12 | clear recollection that there are three questions.  What |
| 11:29:29 | 13 | kind of gun is it, it's yours, and do you have a permit |
| 11:29:34 | 14 | for it. |
| 11:29:35 | 15 | So in light of that, I would submit that you |
| 11:29:38 | 16 | should believe his version as to those questions.  But, |
| 11:29:41 | 17 | either way, it's interrogation. |
| 11:29:45 | 18 | And, of course, his version I think is also |
| 11:29:49 | 19 | more credible in light of the fact that Officer Freedman |
| 11:29:53 | 20 | did not do anything with respect to Ms. Weeks, the other |
| 11:29:57 | 21 | individual in -- in regards to asking about the gun. |
| 11:30:02 | 22 | That makes perfect sense if Mr. Turner had |
| 11:30:05 | 23 | admitted ownership of it, clearly.  If he hadn't, well |
| 11:30:09 | 24 | she just found two people in a vehicle and she found a |
| 11:30:11 | 25 | weapon in there.  It could be either.  It could belong |

| | |
|---|---|
| 11:30:14 | 1 |
| 11:30:18 | 2 |
| 11:30:21 | 3 |
| 11:30:24 | 4 |
| 11:30:28 | 5 |
| 11:30:28 | 6 |
| 11:30:32 | 7 |
| 11:30:36 | 8 |
| 11:30:39 | 9 |
| 11:30:41 | 10 |
| 11:30:44 | 11 |
| 11:30:46 | 12 |
| 11:30:50 | 13 |
| 11:30:53 | 14 |
| 11:30:55 | 15 |
| 11:30:58 | 16 |
| 11:31:02 | 17 |
| 11:31:07 | 18 |
| 11:31:07 | 19 |
| 11:31:11 | 20 |
| 11:31:14 | 21 |
| 11:31:17 | 22 |
| 11:31:19 | 23 |
| 11:31:22 | 24 |
| 11:31:23 | 25 |

1 to either of them.  It simply makes more sense that she
2 had gotten the clear admission from Mr. Turner that it
3 was his weapon.  And so in light of all that, I submit
4 that his version of those facts is more likely to be
5 accurate.
6 The next fact we'd ask the Court to find and
7 it's not disputed is that Mr. Turner was not Mirandized
8 during those questions.  As I said, that's -- that's not
9 disputed.
10 And the last fact we ask the Court to find
11 is -- well the series of facts about the second
12 interrogation, the one done by Detective Monahan.  We
13 know that that was two hours -- approximately two hours
14 after the first statement.  We know that Mr. Turner was
15 in continuous custody during the interim.  And we know
16 that Officer Freeman was present at the outset of it.
17 We know that Mr. Turner was Mirandized by Officer
18 Monahan.
19 There is no testimony he was told anything
20 beyond the standard Miranda warnings.  In other words,
21 Officer Monahan as she stood there looking over, didn't
22 say, hey, your previous statement to me about the gun
23 can't be used.  There's no indication that anything like
24 that occurred.
25 Rather, we just have him being given the

| | | |
|---|---|---|
| 11:31:25 | 1 | standard Miranda warnings. |
| 11:31:27 | 2 | And, we know that Officer Monahan had been |
| 11:31:31 | 3 | briefed at least to some extent about what he was doing. |
| 11:31:34 | 4 | He didn't just sit down with this person and start |
| 11:31:37 | 5 | talking to him.  It goes without saying that obviously |
| 11:31:40 | 6 | he knew a firearm had been found.  He knew that at least |
| 11:31:42 | 7 | the arresting officer believed it belonged to Mr. Turner |
| 11:31:45 | 8 | which is why he was interrogating him. |
| 11:31:50 | 9 | And we know that Officer Monahan -- |
| 11:31:57 | 10 | Detective Monahan clearly had been told in one way or |
| 11:32:01 | 11 | other that based on the investigation at the scene that |
| 11:32:05 | 12 | it was Mr. Turner's gun because the other individual |
| 11:32:08 | 13 | wasn't arrested, and Detective Monahan was brought in to |
| 11:32:11 | 14 | question Mr. Turner about it. |
| 11:32:12 | 15 | So, again, the government didn't present any |
| 11:32:14 | 16 | evidence as to exactly what Officer Monahan or Detective |
| 11:32:18 | 17 | Monahan learned because he did not testify. |
| 11:32:20 | 18 | And of course, the government has the burden |
| 11:32:23 | 19 | of establishing admissibility of its evidence.  They'd |
| 11:32:28 | 20 | just have to put on the testimony of Detective Monahan. |
| 11:32:32 | 21 | I don't know why they did that.  But, we have no idea |
| 11:32:35 | 22 | what he heard over the radio.  We have no idea what he |
| 11:32:38 | 23 | might have heard from Officer Vinyard.  We have no idea |
| 11:32:40 | 24 | what he may have heard from Officer Daugherty. |
| 11:32:43 | 25 | Any of them may have related to him the fact |

| | | |
|---|---|---|
| 11:32:46 | 1 | of the previous statement that I asked the Court to find |
| 11:32:50 | 2 | was made, the previous un-Mirandized statement, that |
| 11:32:54 | 3 | being that Mr. Turner admitted ownership of the gun. |
| 11:32:57 | 4 | There is no testimony that he didn't know |
| 11:32:59 | 5 | about that because there are any number of sources he |
| 11:33:03 | 6 | could have found it out from and the government chose |
| 11:33:05 | 7 | not to present his testimony. |
| 11:33:07 | 8 | But, here there is -- what we got is a |
| 11:33:10 | 9 | sequential interrogation to two different |
| 11:33:12 | 10 | interrogations.  And we need to determine how the Court |
| 11:33:17 | 11 | should view those. |
| 11:33:18 | 12 | The first one I think is simple.  As I said, |
| 11:33:20 | 13 | all the elements of a classic Miranda violation are |
| 11:33:23 | 14 | present, custody, interrogation, and lack of Miranda |
| 11:33:26 | 15 | warning. |
| 11:33:26 | 16 | Now, with respect to that statement, I would |
| 11:33:32 | 17 | submit the law is crystal clear that anything Mr. Turner |
| 11:33:35 | 18 | said to Detective Freeman in the back of the police car |
| 11:33:40 | 19 | has to be suppressed.  There's no -- I submit that |
| 11:33:44 | 20 | that's perfectly clear under Miranda and its progeny. |
| 11:33:48 | 21 | The separate question, the one that is |
| 11:33:51 | 22 | presented by this motion is what effect does that have |
| 11:33:54 | 23 | on the statements later made to Detective Monahan? |
| 11:33:56 | 24 | Well, those statements overlap directly with |
| 11:34:00 | 25 | the key fact in the earlier statement.  I mean the key |

| | | |
|---|---|---|
| 11:34:04 | 1 | fact here is admission of ownership of the firearm. |
| 11:34:06 | 2 | It's really -- essentially, there's two elements the |
| 11:34:09 | 3 | government would need to prove in this offense.  One is |
| 11:34:11 | 4 | that he possessed the firearm.  The other is that he had |
| 11:34:15 | 5 | a felony record.  The felony record can be proven by |
| 11:34:18 | 6 | just looking at the court records. |
| 11:34:19 | 7 | So really, these simple facts, his ownership |
| 11:34:21 | 8 | and admission of ownership is obviously the key fact |
| 11:34:23 | 9 | that came out of either set of questioning. |
| 11:34:26 | 10 | So, the two interrogations overlap directly. |
| 11:34:30 | 11 | There was only -- as I said, there was only two-hour |
| 11:34:34 | 12 | time gap.  He was continuously in custody, and Officer |
| 11:34:37 | 13 | Freedman was present at the beginning of the second |
| 11:34:39 | 14 | interrogation. |
| 11:34:40 | 15 | All appearances are that Officer Monahan |
| 11:34:43 | 16 | knew what had happened up to that point when he began |
| 11:34:45 | 17 | his interrogation. |
| 11:34:47 | 18 | Now, I submit this is governed entirely by |
| 11:34:49 | 19 | *Seibert*.  Now, the government asked questions and they |
| 11:34:54 | 20 | seem to be claiming that *Seibert* requires some sort of |
| 11:35:00 | 21 | Park Police policy to engage in a two-step sequential |
| 11:35:03 | 22 | interrogation. |
| 11:35:05 | 23 | Now, *Seibert* and the Fourth Circuit in |
| 11:35:08 | 24 | *Mashburn* do hold that there has to be intent by the |
| 11:35:13 | 25 | officers to engage in some exploitation of the first |

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 11:35:17 | 1  | statement by means of the second warrant statement.          |
| 11:35:21 | 2  | Nothing in *Seibert* says that intent has to                 |
| 11:35:24 | 3  | be based on a standing policy of the police department       |
| 11:35:26 | 4  | or it has to start at the roadside.                          |
| 11:35:28 | 5  | The issue is that Detective Monahan, by the                  |
| 11:35:30 | 6  | time he began his questioning, set out to simply get         |
| 11:35:34 | 7  | Mr. Turner to repeat the answer he had already given.        |
| 11:35:38 | 8  | And, the circumstances were such that                        |
| 11:35:40 | 9  | Mr. Turner, looking at Detective Monahan and seeing          |
| 11:35:43 | 10 | Detective Freedman there, it was clear -- would have         |
| 11:35:47 | 11 | been clear to any reasonable person that Detective           |
| 11:35:50 | 12 | Monahan would have known what he already said.               |
| 11:35:51 | 13 | And Officer Freedman stood right there and                   |
| 11:35:55 | 14 | watches the Miranda warnings, but nobody says to him, by     |
| 11:35:57 | 15 | the way, what you've already said can't be used.  You're     |
| 11:36:00 | 16 | starting on a fresh slate.                                   |
| 11:36:01 | 17 | So, under the circumstances, I would submit                  |
| 11:36:03 | 18 | that that second Miranda warning does not cure the           |
| 11:36:09 | 19 | violation.                                                   |
| 11:36:10 | 20 | Now, there has been a lot of back and forth                  |
| 11:36:14 | 21 | in the briefs about when a second Miranda warning does       |
| 11:36:18 | 22 | and does not cure a previous unwarned statement.  And I      |
| 11:36:22 | 23 | just want to set out our position as clearly as I can.       |
| 11:36:25 | 24 | There is -- the cases are somewhat confusing                 |
| 11:36:32 | 25 | on this point.  You've got *Elstad* where it's not even      |

| 11:36:38 | 1 | clear that the person was in custody.  The only reason |
| 11:36:41 | 2 | that *Elstad* started on the premise that the person was |
| 11:36:44 | 3 | in custody it was conceded and not argued in any of the |
| 11:36:46 | 4 | courts that we can tell.  The person was not cuffed and |
| 11:36:48 | 5 | he was in his living room. |
| 11:36:52 | 6 | Writing on a blank slate, I don't think most |
| 11:36:54 | 7 | courts find him to be in custody.  So the fact that |
| 11:36:56 | 8 | *Elstad* then becomes this important rule for custodial |
| 11:37:00 | 9 | interrogation is partially why this gets so confusing in |
| 11:37:04 | 10 | this theory of law. |
| 11:37:06 | 11 | But in any event, you got two category of |
| 11:37:08 | 12 | cases set out by *Seibert* on the one hand, by *Elstad* on |
| 11:37:12 | 13 | the other.  *Seibert* involves intentional exploitation -- |
| 11:37:16 | 14 | an intentional use of the second statement to exploit |
| 11:37:20 | 15 | the first.  *Elstad* involves a situation where there's a |
| 11:37:24 | 16 | good faith Miranda mistake. |
| 11:37:26 | 17 | Now, our position is as I said that *Seibert* |
| 11:37:29 | 18 | applies because Officer Monahan had the requisite intent |
| 11:37:32 | 19 | required under *Seibert* to exploit the first statement |
| 11:37:35 | 20 | and therefore more than a simple Miranda warning was |
| 11:37:38 | 21 | required.  And if it does fit within *Seibert*, the law is |
| 11:37:41 | 22 | clear that more than just a simple Miranda warning is |
| 11:37:45 | 23 | required. |
| 11:37:45 | 24 | The government asserts if it doesn't fit |
| 11:37:50 | 25 | within that test, it has to fit in the other test which |

| | | |
|---|---|---|
| 11:37:52 | 1 | is the *Elstad* which says that if you administer Miranda |
| 11:37:59 | 2 | warning before the second statement, then the second |
| 11:38:01 | 3 | statement is fine.  That's the only question as long as |
| 11:38:03 | 4 | there's no actual coercion. |
| 11:38:05 | 5 | Now, we submit that's a misreading of |
| 11:38:10 | 6 | *Elstad*, *Seibert*, and their progeny.  The questioning in |
| 11:38:18 | 7 | the sequential confession case is any case whether the |
| 11:38:21 | 8 | intervening Miranda warnings can reasonably be found to |
| 11:38:25 | 9 | be effective. |
| 11:38:26 | 10 | Now, in both *Elstad* and the Fourth Circuit's |
| 11:38:29 | 11 | case in *Mashburn* which is the follow on case to *Seibert* |
| 11:38:33 | 12 | from the Fourth Circuit, in both of those cases, you |
| 11:38:36 | 13 | have what the Courts refer to as objectively reasonable |
| 11:38:40 | 14 | Miranda violations. |
| 11:38:41 | 15 | In other words, even looking back at it, |
| 11:38:43 | 16 | it's not clear that the person was in custody.  Even if |
| 11:38:46 | 17 | a Court found later that the person was in custody, it's |
| 11:38:49 | 18 | not a situation where you can say this is improper |
| 11:38:52 | 19 | police conduct because it wouldn't have been clear to |
| 11:38:54 | 20 | the police officer on the scene that the person was in |
| 11:38:57 | 21 | custody, and therefore, the time rule of Miranda and the |
| 11:39:02 | 22 | rule of suppression don't further any particular purpose |
| 11:39:08 | 23 | in deferring police conduct. |
| 11:39:10 | 24 | And *Elstad* specifically says that and |
| 11:39:12 | 25 | *Seibert* specifically says that the exclusionary rule |

|||
|---|---|
| 11:39:15 | 1 |
| 11:39:17 | 2 |
| 11:39:19 | 3 |
| 11:39:25 | 4 |
| 11:39:28 | 5 |
| 11:39:33 | 6 |
| 11:39:37 | 7 |
| 11:39:41 | 8 |
| 11:39:43 | 9 |
| 11:39:46 | 10 |
| 11:39:49 | 11 |
| 11:39:53 | 12 |
| 11:39:55 | 13 |
| 11:39:58 | 14 |
| 11:40:01 | 15 |
| 11:40:05 | 16 |
| 11:40:09 | 17 |
| 11:40:10 | 18 |
| 11:40:13 | 19 |
| 11:40:16 | 20 |
| 11:40:19 | 21 |
| 11:40:20 | 22 |
| 11:40:24 | 23 |
| 11:40:32 | 24 |
| 11:40:37 | 25 |

relating to Miranda violation, one of the purposes of it is to deter police misconduct.

And that's why in a case like *Elstad* where the original violation was objectively reasonable, all you need is a midstream recitation of Miranda because as long as you give Miranda before the second statement using the exclusionary rule to exclude the second statement isn't going to deter police misconduct because there was no improper conduct in the first place.

It was mistaken understandably even by the courts.  Looking back at it in this case, we would say do we have a classic Miranda violation, a situation where any police officer on the roadside should know not to ask a question that's going to elicit an incriminating response like did you submit a crime? Because he's cuffed and in the back of a car, and she did that.

So, whether that's intentional or by mistake, either way, it's objectively unreasonable. It's a classic Miranda violation that a police officer should not do.

And, in that case, we would submit that the goals of the exclusionary rule set forth in *Elstad*, *Seibert*, all of them talk of the goal of stopping improper police conduct.  And, we would say that that

| | | |
|---|---|---|
| 11:40:40 | 1 | would apply here. |
| 11:40:41 | 2 | The exclusionary rule relating to the second |
| 11:40:44 | 3 | state would apply because it would deter that first |
| 11:40:48 | 4 | getting the unwarned statement by the roadside.  It |
| 11:40:51 | 5 | would deter that improper police conduct and that's |
| 11:40:54 | 6 | true, as I said whether it was intentional or mistaken. |
| 11:40:58 | 7 | But in any event, what we're simply |
| 11:41:08 | 8 | proposing is that where you have a classic Miranda |
| 11:41:12 | 9 | violation and then a second warnings statement, the |
| 11:41:15 | 10 | Court needs to look at all the circumstances to |
| 11:41:17 | 11 | determine whether simply reciting the Miranda warnings |
| 11:41:22 | 12 | was sufficient to render the second statement voluntary. |
| 11:41:25 | 13 | We'd submit here it wasn't.  The second |
| 11:41:27 | 14 | statement was simply a continuation of the first. |
| 11:41:29 | 15 | Officer Freeman was present at both.  Mr. Turner was in |
| 11:41:32 | 16 | continuous custody in between.  There was only a |
| 11:41:36 | 17 | two-hour gap. |
| 11:41:37 | 18 | Officer Freeman did not tell him that the |
| 11:41:40 | 19 | previous statement can't be used.  The obvious import to |
| 11:41:44 | 20 | Mr. Turner of this situation was that Detective Monahan |
| 11:41:47 | 21 | knew of the earlier statements. |
| 11:41:48 | 22 | And in these circumstances, a simple |
| 11:41:50 | 23 | recitation of Miranda before the second interrogation is |
| 11:41:53 | 24 | not sufficient because the second interrogation is just |
| 11:41:57 | 25 | a continuation of the first. |

11:41:58   1          So, the second set of questions and the

11:42:02   2   second set of answers are not voluntarily given

11:42:05   3   following a knowing waiver because Mr. Turner is simply

11:42:07   4   sitting there believing that he's already given them all

11:42:10   5   the information they want.

11:42:11   6          And I would point out there's a case that

11:42:14   7   cited in the government's sur-reply, *U.S. versus Stewart*

11:42:19   8   which is a Seventh Circuit case from 2008.

11:42:23   9          In that case, the Court did -- the

11:42:27   10   government cites it, but upon reading it, I believe that

11:42:30   11   Your Honor would see the Court did exactly what we are

11:42:32   12   asking the Court to do which is the Court looked at

11:42:38   13   whether -- and I'm referring to page 722.  It's 536 F3d,

11:42:45   14   722.

11:42:46   15          When the officer took the second statement

11:42:48   16   in that case, I believe it was the same officer, but

11:42:50   17   before he took the second statement, the question was

11:42:53   18   had his prior failure to Mirandize been in good faith?

11:42:58   19          That's exactly what the Court looked at.

11:43:00   20   And finding there that there was a good faith

11:43:03   21   understandable explanation for his failure to give the

11:43:06   22   original Miranda warnings, the Court said then *Elstad*

11:43:11   23   and simply giving Miranda warnings is a sufficient cure.

11:43:13   24          So, that's post *Seibert* and post -- in post

11:43:18   25   all the Supreme Court cases on this area.  The Seventh

| | | |
|---|---|---|
| 11:43:21 | 1 | Circuit is looking at it using exactly the test we're |
| 11:43:23 | 2 | using.  And in that case they said since there's a good |
| 11:43:27 | 3 | faith understandably reason why the first set of Miranda |
| 11:43:31 | 4 | warnings weren't given, then we're just going to apply |
| 11:43:33 | 5 | *Elstad* and say a midstream recitation of Miranda is |
| 11:43:38 | 6 | sufficient. |
| 11:43:39 | 7 | Here I would submit the Court should reach |
| 11:43:40 | 8 | the opposite result.  There is no good faith reason.  So |
| 11:43:41 | 9 | the Court should apply a more searching inquiry as to |
| 11:43:44 | 10 | whether the second statement was voluntarily given. |
| 11:43:55 | 11 | And just -- Your Honor, again, it is the |
| 11:43:57 | 12 | government's burden.  They're the ones who chose not to |
| 11:44:00 | 13 | present Officer Monahan and could have enlightened the |
| 11:44:02 | 14 | Court as to exactly what he did know and what his intent |
| 11:44:06 | 15 | was when he took the second statement. |
| 11:44:07 | 16 | THE COURT:  All right. |
| 11:44:12 | 17 | MR. BARKER:  I'd like to also begin with the |
| 11:44:17 | 18 | factual findings that we believe the Court should make. |
| 11:44:24 | 19 | We believe the Court should credit Officer Freedman's |
| 11:44:27 | 20 | testimony over the defendant's. |
| 11:44:29 | 21 | She explained in detail why she didn't ask |
| 11:44:33 | 22 | more questions after asking him about the permit, and |
| 11:44:35 | 23 | that's because she was concerned about Miranda. |
| 11:44:37 | 24 | And as defense counsel drew out in his |
| 11:44:40 | 25 | cross-examination, she has been an officer for a while |

11:44:42  1  and she understands Miranda requirements.

11:44:44  2              And indeed, if this was so clear a situation

11:44:46  3  as to require the warnings as defendant suggest, it's

11:44:49  4  likely that, you know, she would have given the

11:44:53  5  warnings.  The fact that she didn't suggest is one

11:44:55  6  additional fact the Court should consider in crediting

11:44:58  7  her testimony over the defendants.

11:45:00  8              As to why it wasn't in the police report,

11:45:03  9  Officer Freedman explained.  She didn't think it was

11:45:05  10  material, and I think that's very reasonable given that

11:45:07  11  there was a confession in the interview that was

11:45:11  12  memorialized in her report.

11:45:13  13             You know, it didn't become material until

11:45:16  14  the suppression motion happened.  And I think it's

11:45:20  15  also -- the defense points out that this was an

11:45:24  16  important event for the defendant and he is therefore

11:45:27  17  more likely to accurately recall things.

11:45:29  18             You know, you heard Officer Freedman testify

11:45:31  19  that there are aspects she didn't recall.  But you also

11:45:34  20  heard specifics about where it was, when it was, what

11:45:37  21  was found, the car, the windows were up, opening the

11:45:40  22  door, that sort of thing.

11:45:42  23             So, it's not correct to suggest that she is

11:45:45  24  just completely at a loss.  And then, I'd also point out

11:45:48  25  that the defendant, of course, has self interest in the

| | |
|---|---|
| 11:45:51 | 1 |
| 11:45:53 | 2 |
| 11:45:59 | 3 |
| 11:46:01 | 4 |
| 11:46:05 | 5 |
| 11:46:08 | 6 |
| 11:46:11 | 7 |
| 11:46:12 | 8 |
| 11:46:14 | 9 |
| 11:46:17 | 10 |
| 11:46:21 | 11 |
| 11:46:23 | 12 |
| 11:46:25 | 13 |
| 11:46:28 | 14 |
| 11:46:31 | 15 |
| 11:46:37 | 16 |
| 11:46:40 | 17 |
| 11:46:45 | 18 |
| 11:46:47 | 19 |
| 11:46:50 | 20 |
| 11:46:52 | 21 |
| 11:46:56 | 22 |
| 11:46:58 | 23 |
| 11:47:01 | 24 |
| 11:47:05 | 25 |

1    factual findings.

2            As for why Officer Freedman, you know,

3    approached the defendant and asked him about the permit,

4    she testified she concluded it was his because it was

5    found next to the driver's seat of his truck consistent

6    with him putting it there.  And I think that's a pretty

7    reasonable assumption.

8            And indeed under the defendant's version of

9    facts, not convicted by Officer Freedman, she had been

10   focusing on him since the beginning, starting with the

11   marijuana.  So I think it's consistent that she

12   approached him and asked him about the permit because

13   she had concluded it was his, not because he had already

14   told her in response to the question that it was his.

15           At the station house, defendant stated he

16   didn't believe that Officer Freedman was present during

17   the interview.  And I mean, I think that's consistent

18   with her testimony which is that she watched the

19   Mirandizing through the window into the interview room

20   and after that wasn't in the room.

21           As to why Detective Monahan didn't testify,

22   we didn't call him because we think it would be

23   cumulative given what the defendant already said.

24           And the issue here is not -- I mean, the

25   issue here is two things.  Were Miranda warnings

| | | |
|---|---|---|
| 11:47:11 | 1 | required at the time of the stop of the interaction |
| 11:47:13 | 2 | between Officer Freedman and the defendant? |
| 11:47:15 | 3 | And then secondly, if they were and given |
| 11:47:18 | 4 | that they weren't given in this case, does the *Seibert* |
| 11:47:25 | 5 | exception apply given that the defendant was Mirandized |
| 11:47:27 | 6 | at the station house and waived? |
| 11:47:29 | 7 | Now, we already have testimony that the |
| 11:47:31 | 8 | defendant was administered the Miranda warnings at the |
| 11:47:34 | 9 | station house, that he waived those. And as we said in |
| 11:47:36 | 10 | our response, it's not disputed that those warnings and |
| 11:47:39 | 11 | waiver were voluntarily, that the statement was |
| 11:47:41 | 12 | voluntary. And it's not disputed that his statement at |
| 11:47:44 | 13 | the scene that he didn't have a permit was voluntary. |
| 11:47:47 | 14 | The question is whether Miranda warnings |
| 11:47:49 | 15 | were required. And so, we don't feel that Officer -- |
| 11:47:53 | 16 | Detective Monahan could shed light on the fact in |
| 11:47:56 | 17 | dispute. |
| 11:47:56 | 18 | I mean, I guess they're right. We could |
| 11:47:59 | 19 | have confirmed Officer Freedman's testimony that she |
| 11:48:04 | 20 | didn't tell him about those, you know, the statement the |
| 11:48:07 | 21 | defendant made about not having a permit. |
| 11:48:09 | 22 | So, I guess I would agree to that extent. |
| 11:48:10 | 23 | But that would just be cumulative in our view. And to |
| 11:48:13 | 24 | suggest that he could have heard it from other means I |
| 11:48:16 | 25 | think is just speculation not supported by any fact |

```
11:48:20   1   evidence.
11:48:20   2               As for Elstad, we're not suggesting that
11:48:25   3   there has to be a Park Police policy allowing --
11:48:29   4   requiring question first, interrogation to trigger the
11:48:33   5   Seibert exception.  The test is as Justice Kennedy
11:48:38   6   stated it in Seibert and as quoted in our brief.
11:48:41   7               But the fact of a lack of a policy, the lack
11:48:42   8   of a practice and the lack of intent to use that
11:48:45   9   strategy that night is certainly pertinent evidence as
11:48:49  10   to the Seibert standard which is whether the law
11:48:53  11   enforcement deliberately withheld the Miranda warnings
11:48:55  12   at the scene in an effort to undermine Miranda by
11:48:58  13   suppressing its value later at the time of the custodial
11:49:03  14   interrogation.
11:49:04  15               And Officer Freedman testified that it
11:49:07  16   wasn't her intent.  She wasn't even thinking ahead to
11:49:09  17   the interrogation at the station.
11:49:12  18               And I think under that standard the facts
11:49:16  19   that -- there's no policy and no practice of it is
11:49:19  20   certainly very probative evidence.
11:49:21  21               As for the fact of this -- I think even
11:49:29  22   under the defense's view of the case which is that the
11:49:33  23   defendant was asked at the scene about the ownership of
11:49:37  24   the gun, I think even then it's not the case that the
11:49:42  25   Elstad rule is undermined by Seibert here because
```

11:49:47  1   essentially what we have is, yes, the questioning at

11:49:50  2   this station was the same, but there was no choice --

11:49:54  3   there's no deliberate strategy to undermine the Miranda

11:50:00  4   warnings.

11:50:00  5          Even under those circumstances, I don't

11:50:03  6   think -- I think it's reasonable for Officer Freedman to

11:50:06  7   think that the defendant has not been arrested.

11:50:09  8          Yes, he's clearly by seized according to the

11:50:14  9   Fourth Amendment standards.  His liberty is restricted.

11:50:17  10  But, I think the case law is clear and the Supreme Court

11:50:18  11  made this point in *Berkemer versus McCarty* that a

11:50:20  12  seizure for Fourth Amendment purposes is not the same as

11:50:24  13  a custody for Miranda purposes.

11:50:25  14         And I think it's reasonable for her to think

11:50:27  15  that, but especially on the facts as we think are most

11:50:31  16  credible, the fact that she asked him about the permit

11:50:33  17  and didn't stopped there because she was cognizant of

11:50:36  18  her Miranda violations.  It was firmly reasonable for

11:50:39  19  her to conclude that Miranda warnings aren't required

11:50:42  20  for that single question.

11:50:43  21         She had -- she testified to her reason for

11:50:46  22  asking it, that she was -- she had dealt with the issue

11:50:49  23  in the past where a permit made the difference between

11:50:52  24  prosecution with the U.S. Attorney's Office or not and

11:50:54  25  would have determined the arrest.

11:50:59   1          She testified that, you know, she had the

11:51:00   2   defendant and Ms. Weeks put in the car for security

11:51:03   3   purposes and for -- to keep them from the cold.

11:51:08   4          And, you know, I think those are reasons

11:51:10   5   that any reasonable officer at the scene would not make

11:51:13   6   them think that there's custody for Miranda purposes.

11:51:17   7          And, you know, I think typically officers

11:51:21   8   want to have the Miranda warnings done in a more

11:51:25   9   controlled setting where there's a card they can read

11:51:27  10   from and have the signature.

11:51:29  11          And so, I don't think there's any evidence

11:51:32  12   here that would suggest that the *Seibert* exception is

11:51:36  13   triggered.

11:51:37  14          As for the defendant's argument that there

11:51:40  15   should be a test of whether the Miranda warnings were

11:51:44  16   reasonably found to be effective, I think the answer to

11:51:47  17   that is that's the position of the plurality opinion in

11:51:51  18   *Seibert*, but not Justice Kennedy's opinion.

11:51:55  19          And I think the majority of the Court in

11:51:56  20   *Seibert* rejected that.  Justice Kennedy rejected that

11:52:01  21   test by adopting his narrow test.  And the four

11:52:06  22   dissenting judges rejected that by rejecting the

11:52:07  23   exception to *Elstad* altogether.

11:52:08  24          And I think that's what the Seventh Circuit

11:52:10  25   case that we quoted at length in our brief recognizes as

| | | |
|---|---|---|
| 11:52:13 | 1 | well as the other cases cited in the Fourth Circuit |
| 11:52:16 | 2 | *Mashburn* opinion and agreeing with that *Seibert* opinion |
| 11:52:20 | 3 | test. |
| 11:52:20 | 4 | And I think it's pretty clear from the Court |
| 11:52:22 | 5 | and the passage in our brief and that's why we set it |
| 11:52:25 | 6 | out at length that under -- the *Stewart* passage -- about |
| 11:52:32 | 7 | *Seibert* that the test if there's not the deliberate |
| 11:52:38 | 8 | undermining of Miranda with the question-first technique |
| 11:52:41 | 9 | and this is at page seven of our sur-reply is the simple |
| 11:52:46 | 10 | voluntariness inquiry of *Elstad*.  And that is, the |
| 11:52:49 | 11 | inquiry into this unMirandized statement was voluntary |
| 11:52:52 | 12 | or not coerced which again there's not been a dispute |
| 11:52:56 | 13 | about that and whether the second statement obtained |
| 11:52:59 | 14 | after the warnings was, in fact, obtained in compliance |
| 11:53:04 | 15 | with Miranda and was it self-voluntary under the Fifth |
| 11:53:09 | 16 | Amendment. |
| 11:53:09 | 17 | As for the argument that -- and this is |
| 11:53:13 | 18 | actually the same argument.  They're saying, well, even |
| 11:53:15 | 19 | if there wasn't a deliberate effort to undermine Miranda |
| 11:53:19 | 20 | by using the question-first technique, *Elstad* itself |
| 11:53:23 | 21 | dealt with good faith mistakes and shouldn't be read to |
| 11:53:27 | 22 | a case such as this. |
| 11:53:29 | 23 | I guess I'm not exactly clear on their |
| 11:53:31 | 24 | proposed standard whether it is a subjective test or |
| 11:53:34 | 25 | whether the officer had a belief Miranda warnings were |

| | |
|---|---|
| 11:53:38 | 1 |
| 11:53:42 | 2 |
| 11:53:45 | 3 |
| 11:53:48 | 4 |

required or whether it's an objective test about whether it would be reasonable to think they're required or whether it's some alternative test about the clarity of the need for the warnings.

        I think Mr. Richman said at one point that even if it's by mistake, their failure to give warnings is by mistake that *Elstad* should -- I have written down quote, "whether intentional or by mistake", end quote, that if it was objectively unreasonable not to give the warnings, there should be exclusion.

        Well, you know, I think that runs counter to the policy of *Elstad* to say that an officer made a mistake about not giving a warning, but the mistake was objectively unreasonable and therefore a later warning, complete warning is ineffective flies in the face of *Elstad* which was designed to put a bright line rule out there and say if Miranda warnings aren't given initially and, you know, there's an interrogation later that is Mirandized, the later Miranda warning are effective.

        And I think the Court was pretty clear in *Elstad* that the reason for that is that officers needed to be able to rely on the words of the warning as being effective.

        And we don't go about second guessing the psychological effects of earlier statements on the words

| | | |
|---|---|---|
| 11:55:02 | 1 | of the warning. |
| 11:55:02 | 2 | And I think Justice Kennedy is clear about |
| 11:55:04 | 3 | that in his concurrence in *Seibert* where he talks about |
| 11:55:07 | 4 | the clarity of the settled Miranda law and the need for |
| 11:55:11 | 5 | a very limited exception to it. That's why he rejects |
| 11:55:14 | 6 | the plurality test which is the sort of gauging the |
| 11:55:17 | 7 | effectiveness of the Miranda warning under multifactor |
| 11:55:22 | 8 | test. |
| 11:55:23 | 9 | And I don't think that respects the policies |
| 11:55:26 | 10 | of *Elstad*, and I think that's settled. |
| 11:55:29 | 11 | As, you know -- I was researching -- I guess |
| 11:55:36 | 12 | I won't get into that. |
| 11:55:38 | 13 | But even if I guess we accept the defense |
| 11:55:40 | 14 | position that there is this multifactor test into |
| 11:55:44 | 15 | effectiveness, I know the defense sort of disparages the |
| 11:55:51 | 16 | gap in time here saying only two hours. |
| 11:55:52 | 17 | But I would note some of the cases cited in |
| 11:55:55 | 18 | our brief, and I think this is in our response brief |
| 11:55:58 | 19 | near the end. I'm going to say page 13 to 14 involved |
| 11:56:05 | 20 | gaps of less than that, that were found to be enough of |
| 11:56:09 | 21 | a gap. |
| 11:56:09 | 22 | The *Sweets* case I just looked up, I have |
| 11:56:11 | 23 | here with me was an 80-minute gap. And that's cited at |
| 11:56:16 | 24 | the bottom of page 13. |
| 11:56:17 | 25 | And I think some of the others had gaps |

| | |
|---|---|
| 11:56:19 | 1 | along the same lines. |

11:56:19  1  along the same lines.

11:56:20  2        And this test is further different from

11:56:22  3  *Seibert* on the other factors.  In *Seibert* the officer

11:56:25  4  who continued the Mirandizing in the interrogation was

11:56:29  5  the same officer who conducted the unMirandized

11:56:32  6  interrogation.

11:56:33  7        That was not the test here.  And of course,

11:56:35  8  Officer Freedman was at the station, and she may have

11:56:38  9  walked into the room.  I don't -- I haven't actually

11:56:40  10  asked her about whether she walked through before the

11:56:42  11  interrogation.  But she testified that she wasn't there

11:56:45  12  during the interrogation, and she didn't ask any

11:56:48  13  questions and the defendant agreed with that.

11:56:50  14        It's a different officer, different location

11:56:53  15  from Belle Haven up to the District Two Police Station.

11:56:59  16  The gap in time of the two hours and, you know, I think

11:57:04  17  those factors clearly distinguish this from *Seibert* as

11:57:07  18  well.

11:57:11  19        And again, I think I would just fall back on

11:57:13  20  the policy of the *Elstad* decision which is that you

11:57:17  21  know, it recognizes that I suppose inherent in every

11:57:21  22  instance of police questioning, there is some -- some

11:57:24  23  perhaps coercive aspect just from the fact that one is

11:57:28  24  talking to a police officer who represents the

11:57:30  25  possibility of charges.

11:57:31 1        But the *Elstad* Court's decision stood for

11:57:34   2   the principle that we're not going to endow with

11:57:38   3   constitutional significance whatever presumed

11:57:42   4   psychological effect there might be from an earlier

11:57:44   5   Mirandized statement.

11:57:45   6        When there are Miranda warnings, the Court

11:57:47   7   said in *Elstad* that the Miranda warnings themselves

11:57:50   8   contain the words that are sufficient to put a defendant

11:57:51   9   on notice.

11:57:54   10        This is not the defendant's first

11:57:55   11   interaction with the law.  I think that brings things

11:57:57   12   all the more true here.

11:57:58   13        So, you know, I think we'd rest on our

11:58:02   14   briefs for the more nuances, a doctrinal analysis of

11:58:05   15   those case, but I think I've been able to sort of

11:58:08   16   summarize the policy directives that we see underline

11:58:11   17   those cases that justify rejecting the proposed reading

11:58:14   18   that the defense has offered here.

11:58:16   19        We believe that's been rejected by the

11:58:18   20   Supreme Court and by the Fourth Circuit already and

11:58:21   21   other circuits as well as noted in our briefs.

11:58:23   22        THE COURT:  Thank you.

11:58:29   23        MR. RICHMAN:  Your Honor, I'll be very

11:58:32   24   brief.

11:58:32   25        Your Honor, the government has talked a lot

| | | |
|---|---|---|
| 11:58:34 | 1 | about the subjective intent of Officer Freedman.  This |
| 11:58:36 | 2 | case doesn't turn at all on the subjective intent of |
| 11:58:39 | 3 | Officer Freedman.  It turns on the subjective intent of |
| 11:58:43 | 4 | Officer Monahan. |
| 11:58:45 | 5 | The Court -- the government had the burden |
| 11:58:50 | 6 | and did not present Detective Monahan. |
| 11:58:54 | 7 | Here as I said before, there was Miranda |
| 11:58:57 | 8 | violation.  In fact we say it was a classic Miranda |
| 11:58:59 | 9 | violation because it was objectively unreasonable for |
| 11:59:01 | 10 | her to ask that question or those questions without |
| 11:59:04 | 11 | Mirandizing him based on clearly settled law. |
| 11:59:06 | 12 | So, again it doesn't turn on her subjective |
| 11:59:09 | 13 | intent.  It turns on an objective analysis of whether it |
| 11:59:12 | 14 | was clear that he should have been Mirandized.  We |
| 11:59:14 | 15 | submit that it was clear. |
| 11:59:15 | 16 | Now the question then becomes in which |
| 11:59:21 | 17 | category does this case fit?  Does it fit in *Seibert*? |
| 11:59:25 | 18 | We submit that it does because by the time of Detective |
| 11:59:29 | 19 | Monahan's interrogation, we submit that the Court should |
| 11:59:32 | 20 | find that he did have the necessary intent to exploit |
| 11:59:36 | 21 | the prior statement and to essentially overbear the |
| 11:59:41 | 22 | person's belief that he could remain silent without |
| 11:59:46 | 23 | incriminating himself. |
| 11:59:47 | 24 | So, in those circumstances, *Seibert* held |
| 11:59:49 | 25 | that a simple giving of second Miranda -- first set of |

11:59:53  1    Miranda warnings before the second interrogation,

11:59:55  2    *Seibert* held is insufficient and that's why *Seibert*

11:59:59  3    suppressed that second sequential interrogation.

12:00:03  4              Even if *Seibert* does not apply and the Court

12:00:07  5    doesn't find that Officer Monahan's intent was akin to

12:00:08  6    the intent of the officers in *Seibert*, we submit that

12:00:09  7    this is still governed by a test as yet not entirely

12:00:14  8    clarified by the Supreme Court.

12:00:16  9              *Seibert* has characterized *Elstad* as applying

12:00:20  10   the good faith mistakes in failing to Mirandize.  We

12:00:25  11   submit this was not such a case.  This was a classic

12:00:27  12   Miranda violation.

12:00:28  13             And when a classic Miranda violation occurs,

12:00:31  14   the Supreme Court has not been clear as to whether a

12:00:34  15   simple recitation of Miranda warnings before the second

12:00:38  16   statement is sufficient.

12:00:39  17             We submit that it's not in these

12:00:42  18   circumstances.  Mr. Turner -- an objective person in

12:00:45  19   Mr. Turner's position would not have felt remaining

12:00:48  20   silent would have simply protected himself from self

12:00:51  21   incrimination.

12:00:52  22             Therefore, his second set of statements

12:00:55  23   because he wasn't given any additional curative warnings

12:00:58  24   is not voluntary and should be suppressed.

12:01:01  25             And so we submit that the Court -- if there

12:01:04   1   is a classic Miranda violation in the first instance,

12:01:07   2   the Court has to do a more searching inquiry as to all

12:01:10   3   the facts and circumstances of the second to determine

12:01:13   4   whether it's voluntary.  Here we submit that it wasn't.

12:01:16   5           Now, the government just to mention one

12:01:18   6   case, the government brought up the *Sweets* case, a case

12:01:20   7   by Judge Nehemiah where there were two statements

12:01:24   8   80 minutes apart.

12:01:25   9           In that case, the second statement wasn't

12:01:26  10   the same as the first.  It was on a different topic.  So

12:01:30  11   it's a significantly different situation than we have

12:01:32  12   here where there is direct overlap of the single key

12:01:36  13   fact.

12:01:36  14           THE COURT:  All right, thank you.

12:01:37  15           We'll take the morning recess now for about

12:01:39  16   15 minutes.

12:01:53  17           (Court recessed at 12:07 and reconvened at

12:18:47  18   12:18 p.m.)

12:18:47  19           THE COURT:  All right, let the record

12:18:48  20   reflect this is the matter of United States of America

12:18:51  21   versus Sherman Alan Turner.

12:18:53  22           This matter is before the Court on the

12:18:55  23   defendant's motion to suppress statements allegedly made

12:18:57  24   to Officer Freedman and Detective Monahan in connection

12:19:00  25   with his arrest in January of 2009.

| | | |
|---|---|---|
| 12:19:05 | 1 | The following are the findings of fact and |
| 12:19:07 | 2 | conclusion of law, the Court having had an opportunity |
| 12:19:09 | 3 | to observe the witnesses, to consider their testimony, |
| 12:19:12 | 4 | to consider their demeanor and to weigh the credibility |
| 12:19:14 | 5 | of the witnesses. |
| 12:19:16 | 6 | At the outset, this is a case involving a |
| 12:19:21 | 7 | legal question.  And that legal question has to do with |
| 12:19:24 | 8 | whether or not the statements allegedly made by |
| 12:19:28 | 9 | Mr. Turner to Officer Freedman at the scene when he was |
| 12:19:33 | 10 | encountered by Officer Freedman and he was in a police |
| 12:19:37 | 11 | car, whether that statement which was allegedly made |
| 12:19:41 | 12 | concerning whether or not he had a permit for a gun was |
| 12:19:44 | 13 | involuntary because it was made without the officer |
| 12:19:49 | 14 | giving Mr. Turner his Miranda warnings, whether such a |
| 12:19:54 | 15 | statement would be admissible under Miranda and whether |
| 12:19:59 | 16 | those initial unwarned statements rendered involuntary |
| 12:20:03 | 17 | the statements the defendant allegedly made after |
| 12:20:07 | 18 | receiving a Miranda warning and waiving those rights |
| 12:20:10 | 19 | from Detective Monahan at the police station. |
| 12:20:12 | 20 | The evidence from Officer Lynda Turner |
| 12:20:17 | 21 | (sic), United States Park Police was on January 9, 2009 |
| 12:20:20 | 22 | that she was on patrol on GW Parkway.  She drove into |
| 12:20:26 | 23 | Belle Haven parking lot approximately quarter to one, |
| 12:20:30 | 24 | meaning 1 a.m. |
| 12:20:31 | 25 | The park was closed, and of the three |

12:20:35   1   parking lots the defendant's Silverado four-door truck

12:20:39   2   was parked in the furthest away parking lot facing into

12:20:43   3   the -- away from the river, facing in toward the parking

12:20:44   4   lot.

12:20:45   5           She drove up.  She shined her spotlight on

12:20:47   6   the truck and she saw two people inside the truck who

12:20:51   7   were moving around apparently in a state of unrobed who

12:20:54   8   were trying to get their clothes on.

12:20:56   9           She went to the passenger side of the truck,

12:21:01  10   shined her light, and she opened the door and she saw a

12:21:04  11   female in the back with the defendant in the back who

12:21:07  12   was naked.

12:21:08  13           She opened the door and she said that she

12:21:11  14   was opening the door and just before that she saw the

12:21:13  15   defendant move in the back of the truck.  And so when

12:21:17  16   she opened the door, Officer Freedman said that smoke

12:21:22  17   came out and it smelled to her like the smoke that she

12:21:26  18   associates with marijuana.

12:21:28  19           There was some conversation with the two

12:21:30  20   occupants where she asked them to get dressed and to

12:21:35  21   provide some identification.  And the two persons did

12:21:40  22   get dressed.  And she had them come out of vehicle and

12:21:44  23   she looked inside.  And I infer that she had the

12:21:47  24   driver's license in her hand at that time.

12:21:49  25           And she decided to look in to see if there

12:21:53  1   was any weapon or other contraband.  And in the center

12:21:56  2   console she saw a Newport cigarette pack.  And when she

12:22:01  3   looked in the Newport cigarette pack, she saw what she

12:22:05  4   detected to be marijuana cigarettes.

12:22:09  5              She handcuffed the defendant and she had

12:22:11  6   Ms. Weeks, the person who was identified -- the female

12:22:13  7   identified as Ms. Weeks to sit on the curb.

12:22:16  8              She asked the defendant to do so, and he

12:22:18  9   told her that he had a prosthetic and therefore could

12:22:21 10   not sit on the curb.  And so she asked him to stand or

12:22:24 11   sit near the rear of the truck.

12:22:26 12              She called for backup and apparently a

12:22:28 13   helicopter had come over this area as well and was

12:22:31 14   shining a light on this whole area.

12:22:33 15              The second officer to arrive according to

12:22:36 16   Officer Freedman was Officer Vinyard who when he arrived

12:22:41 17   at that point she had, Officer Vinyard put the defendant

12:22:46 18   in handcuffs.

12:22:47 19              The defendant -- she had already put the

12:22:49 20   defendant in handcuffs.  She had Officer Vinyard put the

12:22:53 21   defendant in Officer Vinyard's cruiser.  And Ms. Weeks

12:22:58 22   was put into Officer Freedman's cruiser.  This was to

12:23:01 23   keep them separate.

12:23:02 24              And according to Officer Freedman she had

12:23:05 25   not yet decided whether or not to arrest the defendant

12:23:07   1   or Ms. Weeks at that point and testified that there are

12:23:11   2   times when individuals are encountered on the Parkway in

12:23:15   3   parking lots were not charged with marijuana offenses.

12:23:19   4         Later Officer Daugherty arrived with a drug

12:23:23   5   dog and she told Officer Daugherty about finding the

12:23:27   6   marijuana and the dog was put through the vehicle.

12:23:29   7         She searched the truck with Officer

12:23:33   8   Freedman -- Vinyard.  I'm sorry, Officer Freedman and

12:23:36   9   Officer Vinyard searched the truck.  And according to

12:23:41   10   Officer Freedman, Officer Vinyard observed the handle of

12:23:43   11   a gun and she then recovered it from the back seat.

12:23:48   12         Officer Freedman testified that thereafter

12:23:52   13   there came a point when she went over to the police car,

12:23:58   14   Officer Vinyard's police car where the defendant was

12:24:01   15   seated and she opened the door and asked him do you have

12:24:04   16   a permit for the weapon.

12:24:07   17         And according to her, the defendant said no,

12:24:10   18   not sure.  He didn't make a statement.  She was not

12:24:13   19   clear what he said, but she interpreted his actions to

12:24:16   20   suggest that he had a gun and he knew he should not have

12:24:23   21   a gun.

12:24:24   22         She did not give the defendant any Miranda

12:24:26   23   warning at that point.  And she says that she had not

12:24:29   24   decided whether or not he was under arrest.

12:24:31   25         Obviously, there came a point it seems to me

12:24:34  1    that once she went back to the car with the gun, she had

12:24:38  2    an idea in her mind that the gun belonged to the

12:24:41  3    defendant.  I'm not sure how she decided it was the

12:24:43  4    defendant as opposed to Ms. Weeks, except her testimony

12:24:46  5    that it was besides the driver's side in a position that

12:24:50  6    would be easy for a right-handed driver to pull it out,

12:24:54  7    does seem to have some merit.

12:24:56  8            And, she had said at that point that she

12:25:01  9    knew the defendant was going to be arrested.  She had

12:25:04  10   not told him what he was under arrest for, but he was

12:25:07  11   definitely going to be arrested.

12:25:09  12           She indicated that at that point that she

12:25:12  13   had no plan necessarily to have Detective Monahan

12:25:18  14   question the defendant at the police station.  And she

12:25:24  15   did describe to the defendant approximately at 1:15 or

12:25:29  16   1:30 that he was under arrest and that she was going to

12:25:32  17   arrange for his vehicle to be taken away.

12:25:35  18           And she, Officer Freeman waited at the scene

12:25:38  19   with Ms. Weeks until Ms. Weeks was picked up

12:25:42  20   approximately half an hour or so later.

12:25:45  21           Now, Officer Freedman testified that when

12:25:47  22   she arrived at District Two station she saw Sergeant

12:25:51  23   Detective Monahan and asked him if he would want to do

12:25:54  24   the interview.

12:25:56  25           He asked her -- Detective Monahan asked

| | | |
|---|---|---|
| 12:26:00 | 1 | Officer Freedman if she wanted Detective Monahan to do |
| 12:26:05 | 2 | the interview and she said yes. |
| 12:26:07 | 3 | She is not sure what she told Detective |
| 12:26:10 | 4 | Monahan about what had happened -- what the defendant |
| 12:26:12 | 5 | had said at the time.  But she said she may have shown |
| 12:26:17 | 6 | Detective Monahan the gun and the drugs.  And I infer |
| 12:26:20 | 7 | that she probably did show him the guns and the drugs. |
| 12:26:23 | 8 | Officer Freedman was present when Detective |
| 12:26:26 | 9 | Monahan administered Miranda warning.  She's actually |
| 12:26:30 | 10 | signed it as a witness and she says that she was not |
| 12:26:33 | 11 | standing there besides officer -- Detective Monahan as |
| 12:26:37 | 12 | she questioned the defendant, but that she went to the |
| 12:26:40 | 13 | next room or area adjoining this area where the |
| 12:26:44 | 14 | defendant was being questioned by Detective Monahan and |
| 12:26:47 | 15 | was working on processing the evidence. |
| 12:26:50 | 16 | Officer Freedman did not display a weapon or |
| 12:26:55 | 17 | threaten the defendant at any time during the time they |
| 12:26:58 | 18 | were at the Belle Haven parking lot. |
| 12:27:20 | 19 | The defendant was cuffed behind his back by |
| 12:27:24 | 20 | Officer Freedman before -- and he was in that state when |
| 12:27:28 | 21 | Officer Vinyard arrived and placed him in the back of |
| 12:27:30 | 22 | Officer Vinyard's vehicle, police vehicle with his hands |
| 12:27:36 | 23 | handcuffed behind his back. |
| 12:27:43 | 24 | Officer Freedman did not ask Ms. Weeks about |
| 12:27:46 | 25 | the gun or the drugs, and her police report did not |

12:27:54  1   mention questioning Mr. Turner at the scene, nor did the

12:28:01  2   criminal complaint mention that.

12:28:14  3          Officer Freedman indicated that she asked

12:28:16  4   about whether or not the defendant had a permit because

12:28:18  5   previously several years ago she had a case where a

12:28:21  6   person was stopped on the Parkway and that person had a

12:28:25  7   weapon, that she prepared the paperwork for the case,

12:28:28  8   sent it to the U.S. Attorney's Office and the U.S.

12:28:31  9   Attorney decided not to charge the individual because

12:28:34  10  the individual had a permit, even though permits do not

12:28:37  11  allow -- state permit does not allow a person to carry

12:28:41  12  weapon on federal property.  She thought if he had a

12:28:45  13  permit that perhaps she would exercise some discretion.

12:28:47  14          The defendant, Mr. Sherman Turner testified

12:28:49  15  and he admits or agrees that he was in the Belle Haven

12:28:53  16  parking lot with Ms. Weeks and that Officer Freedman did

12:28:58  17  come to the truck, shine a light and open the door and

12:29:03  18  that the officer seemed a bit taken aback to see

12:29:06  19  Ms. Weeks in a state of undress and that Officer

12:29:12  20  Freedman told Ms. Weeks to get dressed.

12:29:15  21          And at that point she looked around and

12:29:17  22  expressed some disbelief that the defendant and

12:29:21  23  Ms. Weeks would be there doing whatever it appeared that

12:29:24  24  they were doing.

12:29:25  25          According to Mr. Turner, the officer said if

12:29:29   1   you have an open container -- I see you have an open

12:29:33   2   container.  And if I look, what else will I find?  And

12:29:38   3   the -- Mr. Turner says he said to Ms. -- Officer

12:29:43   4   Freedman he did not smoke.

12:29:45   5        And at that point, Officer Freedman picked

12:29:47   6   up the pack of cigarettes.  And according to the

12:29:52   7   defendant he said that Ms. -- Officer Freedman said I

12:29:57   8   guess that's not yours.  And obviously Ms. Weeks was

12:30:00   9   there as well.  And Officer Freedman did not ask

12:30:05  10   Ms. Weeks if the cigarettes belonged to her.

12:30:08  11        And according to the defendant, Officer

12:30:12  12   Freedman said not only has he disrespected you in a

12:30:16  13   public place, but he is -- has the audacity to pin this

12:30:21  14   on you, meaning that Officer Freedman was saying to

12:30:25  15   Ms. Weeks that the defendant was taking advantage of her

12:30:27  16   in a public place and also pinning the drug charge on

12:30:31  17   her.

12:30:31  18        She did not -- Officer Freedman did not ask

12:30:35  19   Ms. Weeks about the cigarettes.

12:30:38  20        Mr. Turner recalled there was a helicopter

12:30:41  21   was shining the light down.  And he agreed that Officer

12:30:47  22   Freedman did handcuff him, acknowledged that he could

12:30:50  23   not sit down and had him stand at the rear of the

12:30:53  24   vehicle.

12:30:54  25        And when Officer Vinyard arrived, he,

12:30:57  1   Mr. Turner acknowledges that Officer Vinyard put him in

12:31:02  2   his police vehicle with his hands behind his back.

12:31:05  3           Now, it seems to me there is some issue,

12:31:07  4   very mild, about whether Ms. Weeks and Mr. Turner were

12:31:11  5   placed in the back of these police vehicles whether or

12:31:14  6   not the windows were down.

12:31:15  7           I infer because it was January, they were in

12:31:17  8   some state of undress and they had just been putting

12:31:20  9   their clothes back on that they were put in vehicles

12:31:23  10  with the windows up.

12:31:25  11          And there was certainly some contact between

12:31:31  12  Mr. Turner and Officer Freedman about this gun which I'm

12:31:36  13  going to talk about in just a moment.

12:31:38  14          Mr. Turner said the drug dog did come and

12:31:40  15  went in and out of his truck and that after he had

12:31:44  16  gone -- the dog went in and out of his truck that

12:31:47  17  Officer Freedman came over to the police car and told

12:31:49  18  him that you're going to be charged with being in a park

12:31:55  19  after dark, lewd behavior and possession of marijuana.

12:32:00  20          Thereafter, Mr. Turner says that the canine

12:32:08  21  officer had gone over -- Officer Daugherty had gone over

12:32:12  22  to the rear of his truck and come over to Mr. Turner and

12:32:17  23  asked him questions about his truck in terms of what

12:32:19  24  kind of work did he do, what was the nature of the tools

12:32:24  25  he had in the back of his truck and Mr. Turner reported

| | | |
|---|---|---|
| 12:32:26 | 1 | that he was an electrician. |
| 12:32:28 | 2 | And thereafter then the officer went back -- |
| 12:32:30 | 3 | Officer Daugherty.  And I infer Vinyard as well went |
| 12:32:36 | 4 | back to his truck and continued searching it.  And I |
| 12:32:39 | 5 | believe that Mr. Turner said that a police officer, I |
| 12:32:42 | 6 | believe Daugherty found the cane that's not really the |
| 12:32:46 | 7 | subject matter of this motion to suppress, but a cane |
| 12:32:48 | 8 | was found in the back seat of the vehicle as well. |
| 12:32:51 | 9 | After that, the front seat was slid forward. |
| 12:32:56 | 10 | And at some point during this particular point, |
| 12:32:59 | 11 | according to Ms. -- Officer Freedman and I infer the |
| 12:33:03 | 12 | defendant that Officer Vinyard observed the weapon. |
| 12:33:07 | 13 | Then Officer Freedman retrieved the weapon. |
| 12:33:11 | 14 | Now, according to Mr. Turner, at this point, |
| 12:33:16 | 15 | Officer Freedman came over to the police car, opened the |
| 12:33:18 | 16 | door and asked him a series of questions.  The questions |
| 12:33:22 | 17 | according to Mr. Turner were what kind of gun is that? |
| 12:33:26 | 18 | That was the first question.  Second -- and he |
| 12:33:28 | 19 | apparently answered Glock 26.  The second, is this -- |
| 12:33:32 | 20 | and this is not yours, right?  Or this is yours, right? |
| 12:33:36 | 21 | And then she asked him do you have a permit.  And |
| 12:33:38 | 22 | according to the defendant he said whatever in a flip |
| 12:33:41 | 23 | fashion. |
| 12:33:41 | 24 | And at -- additionally, Officer Freedman |
| 12:33:47 | 25 | asked Mr. Turner, have you been convicted of a felony. |

12:33:51  1   And the defendant reported, yes, I had been convicted of

12:33:54  2   a felony 20 years ago in 1983 or '84.

12:33:59  3        Mr. Turner reports being taken to the police

12:34:02  4   station in the holding area.  He said that Officer

12:34:06  5   Freedman was present when he was given Miranda warnings.

12:34:10  6   He described it as being in another room, but it was in

12:34:13  7   an area where she could see him and he could see her,

12:34:16  8   although he did not report seeing her again after he saw

12:34:19  9   her on the scene and at the police station when the

12:34:21  10  Miranda warning was done.

12:34:22  11       And Detective Monahan he says -- Mr. Turner

12:34:26  12  says did administer Miranda warning.  He answered the

12:34:30  13  questions after being informed of his rights.

12:34:34  14       So, the question presented is first whether

12:34:52  15  the defendant was in custody for purposes of Miranda on

12:34:56  16  the scene at the Belle Haven parking lot when Officer

12:35:01  17  Freedman went over to ask him questions about this gun.

12:35:04  18       I think that the key question is whether or

12:35:09  19  not he was in custody for purposes of Miranda and

12:35:12  20  whether he was entitled to Miranda warnings at that

12:35:14  21  point.

12:35:15  22       I found that he was in custody and that he

12:35:17  23  was entitled to Miranda warnings because he was in

12:35:19  24  handcuffs.  He had been locked in the back of the police

12:35:22  25  cruiser.  The officer had already made a judgment to

| | | |
|---|---|---|
| 12:35:25 | 1 | charge him at the very least with some offense involving |
| 12:35:30 | 2 | this marijuana. |
| 12:35:31 | 3 | She had the drug dog there.  She called for |
| 12:35:34 | 4 | backup.  And the defendant's vehicle had been -- she was |
| 12:35:39 | 5 | making arrangements for his vehicle to be taken away. |
| 12:35:41 | 6 | At that point, I think that he was entitled |
| 12:35:43 | 7 | to a Miranda warning.  It's not about whether or not he |
| 12:35:48 | 8 | was free to leave.  I think that he had been |
| 12:35:50 | 9 | sufficiently placed in custody at the point which he was |
| 12:35:58 | 10 | handcuffed in the police car, his liberty restrained, |
| 12:36:01 | 11 | and his vehicle basically being impounded.  And she had |
| 12:36:07 | 12 | found the marijuana.  So I think that he, Mr. Turner was |
| 12:36:13 | 13 | entitled to Miranda warning from Officer Freedman. |
| 12:36:17 | 14 | I think Officer Freedman's questions about |
| 12:36:19 | 15 | the gun were intended to elicit a response.  And that |
| 12:36:23 | 16 | response, whatever it would have been would have been |
| 12:36:25 | 17 | incriminating.  You can't have a gun in the park.  He |
| 12:36:28 | 18 | was in the park with a gun.  It didn't matter whether he |
| 12:36:31 | 19 | had a felony record or not.  If he had a gun in the |
| 12:36:34 | 20 | park, that's against the law for which he could be |
| 12:36:36 | 21 | charged. |
| 12:36:36 | 22 | And while I understand what Officer Freedman |
| 12:36:39 | 23 | said about her -- she says her thought process, I still |
| 12:36:43 | 24 | think for purposes of the Fifth Amendment analysis that |
| 12:36:47 | 25 | he would have been entitled to his Miranda warning.  And |

| | | |
|---|---|---|
| 12:36:50 | 1 | the -- that she knew or reasonably should have known |
| 12:36:54 | 2 | that this question was likely to elicit an incriminating |
| 12:36:58 | 3 | response under *Rhode Island versus Innis*. |
| 12:37:01 | 4 | Now, the case law that I think we have to |
| 12:37:06 | 5 | consider *Elstad*, *Missouri versus Seibert* and I think the |
| 12:37:12 | 6 | key case for this decision today is *Mashburn* from the |
| 12:37:17 | 7 | Fourth Circuit is whether the initially unwarned |
| 12:37:20 | 8 | statements rendered involuntary the statements the |
| 12:37:23 | 9 | defendant made after receiving and waiving Miranda |
| 12:37:25 | 10 | rights. |
| 12:37:26 | 11 | Now, the burden is on the government to |
| 12:37:32 | 12 | establish that the statement was voluntary and |
| 12:37:36 | 13 | admissible under Miranda. |
| 12:37:38 | 14 | The Miranda warnings are typically thought |
| 12:37:40 | 15 | to be the way the government would establish that a |
| 12:37:44 | 16 | person was fully informed of their rights and that their |
| 12:37:47 | 17 | rights were voluntarily and -- knowingly and voluntarily |
| 12:37:50 | 18 | waived. |
| 12:37:52 | 19 | And the case that the government is trying |
| 12:37:58 | 20 | to address and the subject of this motion to suppress is |
| 12:38:03 | 21 | whether Detective Monahan's questioning of the defendant |
| 12:38:09 | 22 | was a part of the deliberate two-stage interrogation |
| 12:38:14 | 23 | strategy that was used to obtain a post-warning |
| 12:38:18 | 24 | confession.  That is to say that it was a part of some |
| 12:38:22 | 25 | plan, whether it was deliberate police policy or not |

12:38:26  1   between Officer Freedman and Detective Monahan to

12:38:29  2   subvert the defendant's Fifth Amendment rights here.

12:38:32  3            I acknowledge that the Fourth Circuit has

12:38:35  4   said that it has not decided who has the burden of

12:38:38  5   proof.  But it seems to me that the government has the

12:38:41  6   burden of proof and so that burden is on them.

12:38:43  7            Here, Officer Freedman's testimony is that

12:38:47  8   at the scene she had not talked to Officer Monahan about

12:38:53  9   questioning the defendant, had not really given thought

12:38:56 10   to what she would do at the police station.

12:38:59 11            As I heard her testimony and viewing her

12:39:02 12   testimony in the light in terms of weighing the

12:39:05 13   credibility, it seemed credible to me when she was at

12:39:08 14   the police station it was almost -- it was not

12:39:11 15   intentional or not preplanned that Detective Monahan

12:39:14 16   would be there, that her sergeant would be there.

12:39:16 17   Remember, this is the middle of the night.

12:39:18 18            Detective Monahan is a detective and she's

12:39:20 19   not.  She's a patrol officer.  And her reasons for

12:39:24 20   allowing Detective Monahan to conduct the interview

12:39:26 21   where she thought he might be more skilled at it seems

12:39:29 22   reasonable to me and credible.  So I credit that

12:39:33 23   testimony.

12:39:34 24            She did not testify that there was any plan

12:39:38 25   on her part to somehow undermine the defendant's Miranda

| | | |
|---|---|---|
| 12:39:45 | 1 | rights.  And the Court in *Missouri versus Seibert* |
| 12:39:53 | 2 | plurality opinion, I think everyone now agrees that we |
| 12:39:56 | 3 | got to view that opinion and focus more on what Justice |
| 12:40:00 | 4 | Kennedy said the test is. |
| 12:40:04 | 5 | But, the bottom line is I think that the |
| 12:40:07 | 6 | case is governed by *Elstad*.  And the focus should be on |
| 12:40:13 | 7 | whether the second statement was knowingly and |
| 12:40:16 | 8 | voluntarily made. |
| 12:40:19 | 9 | And, the Court in the *Missouri versus* |
| 12:40:23 | 10 | *Seibert* case says that absent deliberately coercive or |
| 12:40:27 | 11 | improper tactics to obtain the initial statement, the |
| 12:40:29 | 12 | mere fact that a statement has been made -- a suspect |
| 12:40:33 | 13 | has made unwarned admission does not warrant a |
| 12:40:36 | 14 | presumption of compulsion as any subsequent warned |
| 12:40:40 | 15 | statement. |
| 12:40:40 | 16 | And so what I have to do here is decide if |
| 12:40:43 | 17 | there was any plan.  And I think that there is no |
| 12:40:47 | 18 | evidence here to support the idea that there was some |
| 12:40:50 | 19 | plan between Officer Freedman and Detective Monahan. |
| 12:40:56 | 20 | I have considered the factors that are set |
| 12:40:58 | 21 | forth in *Seibert* about the completeness and details in |
| 12:41:01 | 22 | the questioning as it's been described to me. |
| 12:41:02 | 23 | Detective Monahan's questioning of the |
| 12:41:05 | 24 | defendant included questions about his military history, |
| 12:41:08 | 25 | his family, his prior -- the defendant's prior law |

12:41:14  1    enforcement background.  That's much more detailed than

12:41:16  2    the statements that were elicited by Officer Freedman at

12:41:20  3    the scene.

12:41:21  4            Obviously the content of the statement does

12:41:24  5    overlap.  That is to say the two statements do focus in

12:41:26  6    on the defendant's status and possession of the weapon.

12:41:30  7            The timing and setting of the first and

12:41:33  8    second statement, well, it's apparently two hours

12:41:36  9    between the time of the initial questioning by Officer

12:41:39  10   Freedman and the questioning at the police station.

12:41:41  11           The continuity of the personnel, obviously

12:41:44  12   the questions are different.  We have Detective Monahan

12:41:49  13   asking questions after giving Miranda warning as

12:41:51  14   distinct from Officer Freedman at the scene.  And the

12:41:55  15   fact, the degree to which the interrogated questions

12:41:58  16   treated the second round is continuous with the first.

12:42:01  17           I don't think there's any evidence here of

12:42:03  18   what Detective Monahan did except what has been elicited

12:42:06  19   and that does not -- from the defendant, and that does

12:42:09  20   not seem to suggest to me it was continuous because

12:42:13  21   according to the defendant, the questions asked by

12:42:17  22   Officer Monahan focused on several areas that were not

12:42:19  23   encompassed in the initial questioning by Officer

12:42:19  24   Freedman.

12:42:25  25           So, I don't think we have an issue where I

| | | |
|---|---|---|
| 12:42:28 | 1 | need to focus in on *Seibert*, but then to focus in on |
| 12:42:33 | 2 | *Elstad*. |
| 12:42:33 | 3 | And obviously the issue in *Elstad* is one of |
| 12:42:38 | 4 | voluntariness.  And where a Miranda warning has been |
| 12:42:44 | 5 | given, the Court has to look at whether the second |
| 12:42:48 | 6 | statement was voluntarily made. |
| 12:42:50 | 7 | Obviously the defendant here had an idea |
| 12:42:52 | 8 | that he was in some trouble in the middle of the night |
| 12:42:55 | 9 | with a gun on the Parkway when he was taken into custody |
| 12:43:01 | 10 | and Ms. Weeks was not. |
| 12:43:04 | 11 | And apparently the defendant, you know, had |
| 12:43:08 | 12 | reason to be concerned about this.  And so, I don't |
| 12:43:11 | 13 | think that he was coerced by Detective Monahan when |
| 12:43:16 | 14 | Detective Monahan read him the Miranda warnings and the |
| 12:43:19 | 15 | defendant made a decision to answer questions.  He |
| 12:43:24 | 16 | certainly did not have to.  He was not being threatened |
| 12:43:28 | 17 | in any way. |
| 12:43:28 | 18 | Ms. -- Officer Freedman was not present |
| 12:43:32 | 19 | participating in any questioning.  And so I think that |
| 12:43:36 | 20 | in this situation that what I have here is an absence of |
| 12:43:42 | 21 | evidence that Officer Freedman deliberately employed a |
| 12:43:46 | 22 | question-first interrogation strategy and that the |
| 12:43:51 | 23 | Miranda warnings were required at the scene.  And since |
| 12:43:56 | 24 | she did not give them, I will suppress any statement |
| 12:44:01 | 25 | defendant made to Detective Freedman because it violates |

12:44:04   1   Miranda and she should have given that warning.

12:44:06   2           As it relates to statements made to

12:44:09   3   Detective Monahan since these statements were made after

12:44:11   4   he received a Miranda warning at the police station some

12:44:14   5   two hours later and for the reasons I've already

12:44:17   6   outlined, I think that the statements are knowingly and

12:44:19   7   voluntarily made.  So the statement to Detective Monahan

12:44:22   8   will be received.

12:44:23   9           So, the motion to suppress is granted in

12:44:25   10  part and denied in part.  Thank you.  You all are

12:44:30   11  excused.

12:44:32   12          MS. AHMAD:  Thank you, Your Honor.

12:44:32   13          THE COURT:  Thank you.

12:44:56   14          Let me make one other statement here.

12:44:58   15  Mr. Barker, I don't know you, and I don't want you to

12:45:02   16  take my earlier statements as to suggest that you have

12:45:04   17  withheld exculpatory evidence.  I didn't say that, and I

12:45:08   18  did not intend to suggest that.

12:45:09   19          MR. BARKER:  Thank you, Your Honor.

12:45:10   20          THE COURT:  But I do believe and I hope that

12:45:13   21  you all know that the judge expects that the defense

12:45:17   22  would cooperate with the government.

12:45:19   23          And I appreciate the defense trying to let

12:45:21   24  me know that they weren't blaming you, that they were

12:45:24   25  blaming the Park Police.

| | | |
|---|---|---|
| 12:45:25 | 1 | And hopefully the Park Police will get the |
| 12:45:29 | 2 | message that everybody ought to work together here to |
| 12:45:31 | 3 | insure that we can put on a case. |
| 12:45:33 | 4 | MR. BARKER:  Thank you, Your Honor. |
| 12:45:34 | 5 | THE COURT:  So, I take back any intent to |
| 12:45:37 | 6 | suggest to you that I was insulted.  I'm not insulted. |
| 12:45:40 | 7 | I'm just trying to make sure everybody was on the same |
| 12:45:43 | 8 | page. |
| 12:45:43 | 9 | MR. BARKER:  Thank you. |
| 12:45:47 | 10 | (Proceeding concluded at 12:45 p.m.) |
| 12:45:47 | 11 | |
| 12:45:47 | 12 | |
| 12:45:48 | 13 | |
| 12:45:48 | 14 | |
| 12:45:48 | 15 | |
| 12:45:49 | 16 | |
| | 17 | |
| | 18 | |
| | 19 | |
| | 20 | |
| | 21 | |
| | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

```
 1

 2                    CERTIFICATE OF REPORTER

 3

 4            I, Renecia Wilson, an official court

 5   reporter for the United State District Court of

 6   Virginia, Alexandria Division, do hereby certify that I

 7   reported by machine shorthand, in my official capacity,

 8   the proceedings had upon the motions in the case of

 9   United States of America vs. Sherman Alan Turner.

10            I further certify that I was authorized and

11   did report by stenotype the proceedings and evidence in

12   said motions, and that the foregoing pages, numbered 1

13   to 122, inclusive, constitute the official transcript of

14   said proceedings as taken from my shorthand notes.

15            IN WITNESS WHEREOF, I have hereto

16   subscribed my name this 18th day of February , 2010.

17

18                           /s/
                      Renecia Wilson, RMR, CRR
19                    Official Court Reporter

20

21

22

23

24

25
```